Antony BROWN, et al., Plaintiffs,

v.

PRO FOOTBALL, INC., d/b/a Washington Redskins, et al., Defendants.

Civ. A. No. 90–1071 (RCL).

United States District Court, District of Columbia.

Dec. 13, 1993.

Joseph A. Yablonski, Daniel B. Edelman and John F. Colwell, Yablonski, Both & Edelman, Washington, DC, for plaintiffs.

Peter J. Nickles, Gregg H. Levy, Sonya D. Winner and Jerome D. Sorkin, Covington & Burling, Washington, DC, for defendants.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This case comes before this court on plaintiffs' motion for an award of attorney's fees under Section 4 of the Clayton Act, 15 U.S.C. § 15(a).[1] Having considered the extensive pleadings and memoranda of both parties, this court shall order further discovery in order to determine the reasonable hourly rate to which plaintiffs' counsel is entitled.

---

**1.** 15 U.S.C. § 15(a) provides as follows (emphasis added): "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws ... shall recover threefold the damages by him sustained, and *the cost of suit, including a reasonable attorney's fee.*"

## I. BACKGROUND

The case underlying this attorney's fee litigation was an antitrust action brought by a. class of professional football players who played on developmental squads of the twenty-eight National Football League teams. The class sued the twenty-eight teams of the National Football League (collectively the "NFL") and the NFL itself for fixing salaries. Plaintiffs prevailed, and a jury verdict awarded plaintiffs $30,349,642.00.

Plaintiffs were represented by Mr. Joseph A. Yablonski, lead counsel and a member of the bar for 27 years; Daniel B. Edelman, who graduated from law school in 1969; John F. Colwell, who graduated from law school in 1985; and Charles R. Both, who graduated from law school in 1968 and who performed discrete tasks in this case. The law firm of Yablonski, Both & Edelman hired two associates to work on the pretrial and trial of *Brown:* James C. Moser and Robert G. Kaler.

Plaintiffs claim $1,594,367.50 in attorney's fees,[2] $142,397.51 in litigation expenses,[3] and at least $21,762.50 in fees and costs incurred in this fee litigation.[4] Defendants concede that plaintiffs are entitled to a reasonable attorney's fee,[5] but contest the amount. The issue in this case is the amount of fees to which plaintiffs are entitled.

## II. ATTORNEY'S FEES

"The initial estimate of a reasonable attorney's fee"—the so-called lodestar fee—"is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Blum v. Stenson,* 465 U.S. 886, 888, 104 S.Ct. 1541, 1544, 79 L.Ed.2d 891 (1984) (citations omitted).[6] To determine the reasonable attorney's fee in this case, this court will first discuss the reasonable hourly rate and then turn to the reasonableness of the number of hours claimed.

### A. Reasonable Hourly Rate

The parties appear to agree that plaintiffs' counsel is entitled to a "reasonable attorney's fee" under the Clayton Act. It is an axiom of attorney's fee law that a "reasonable" attorney's fee award is one that "yield[s] the same level of compensation that would be available from the market." *Missouri v. Jenkins,* 491 U.S. 274, 286, 109 S.Ct. 2463, 2470, 105 L.Ed.2d 229 (1989).[7] The parties disagree on what plaintiffs' counsel could have earned in the marketplace for the legal services they performed in *Brown.* More fundamentally, the parties dispute what constitutes the best evidence of what plaintiffs' counsel could have earned in the marketplace for that work.

Defendants contend that plaintiffs' counsels' established billing history constitutes the best evidence of what they could have earned in the market for their services in this case. Defendants rely on the well-established presumption that a firm's established billing rate is the best evidence of what counsel could have earned in the market. *See Laffey v. Northwest Airlines, Inc.,* 746

---

2. Plaintiffs have claimed $1,551,592.50 in their original application and an additional $42,775.00 in their application supplement.

3. Plaintiffs have claimed $139,970.58 in their original application, an additional $1,690.95 in their application supplement, and an additional $735.98 in their Reply Memorandum, Exhibit E.

4. Plaintiffs have claimed $21,762.50 in their original application, and have claimed additional hours in Exhibit D to their Reply Memorandum.

5. Nevertheless, defendants have made clear their assumption that defendants owe a reasonable attorney's fee only if plaintiffs prevail on appeal of the merits.

6. A district court may adjust this lodestar fee when necessary in a particular case. *See Blum,* 465 U.S. at 888, 104 S.Ct. at 1544. Plaintiffs in the present case have not requested any fee enhancements.

7. Although the *Jenkins* Court was construing 42 U.S.C. § 1988, the methodology developed in § 1988 cases has been applied to many other fee-shifting statutes. For example, the lodestar/multiplier framework as developed in caselaw construing § 1988 applies to fees awarded under other fee-shifting statutes as well. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 561–66, 106 S.Ct. 3088, 3096–99, 92 L.Ed.2d 439 (1986) (implying that the lodestar/enhancement analysis applies to all attorney's fees statutes that require payment of a "reasonable" fee).

F.2d 4, 24–25 (D.C.Cir.1984), *overruled in part on other grounds, Save Our Cumberland Mountains, Inc., v. Hodel [SOCM ]*, 857 F.2d 1516 (D.C.Cir.1988). Defendants claim that plaintiffs' lead counsel's established billing rate was about $295 per hour in 1993, and defendants concede no more liability than that.[8]

Plaintiffs, by contrast, contend that their counsel lack a relevant billing history. Absent a relevant billing history, the best evidence of what their counsel could have earned in the market—that is, the best evidence of an appropriate fee award—is a collection of matrices, affidavits, and other evidence presented by plaintiffs recording the prevailing rates charged by similarly experienced lawyers for similar legal services in the District of Columbia. The matrices and other evidence produced by plaintiffs would establish plaintiffs' lead counsel's hourly rate at about $325–$340 in 1993.[9] Plaintiffs' counsel lacks a relevant billing history, plaintiffs argue, on two alternative grounds. The first is based on this Circuit's *en banc* decision in *SOCM;* the second invokes the Supreme Court's decision in *Blum.* The court will consider each in turn.

### 1. SOCM

█ Plaintiffs' first argument is that their counsel does have a billing history, but it is deflated by counsels' long history of altruistically charging worthy clients reduced rates.

Because of their altruism, counsels' billing history does not reflect what they could be earning in the market. Plaintiffs invoke this Circuit's *en banc* determination that if a firm's billing history does not reflect the firm's market value because the firm has intentionally lowered its rates for non-economic, public-spirited reasons, courts must fix fee awards according to reliable matrices and other evidence that indicate the rates prevailing for the services of similarly experienced lawyers in the relevant market of legal services. *See SOCM,* 857 F.2d at 1524.

To succeed under this argument, plaintiffs' counsel must show that the work they have done in this case is in the public interest and that the fees they have accepted for this type of work are below the market rate. *See SOCM,* 857 F.2d at 1524. Plaintiffs have failed to establish the second prong.[10]

Plaintiffs assert that their counsels' rates are "well below the rates charged by attorneys of comparable skill, experience and reputation in this community." (Pls.' Supplemental Mem., at 4.) Yet plaintiffs have produced scant evidence to support this claim. Plaintiffs rely too heavily on the fact that the fees of defense counsel are higher than theirs, overlooking the fact that defense counsel is only one firm in town and that no single firm's billing rates are presumptively representative of all similar firms across the city.[11] Plaintiffs also refer this court to their

---

8. Defendants concede even less liability for work done by counsel in previous years, when counsel charged lower rates.

   Defendants argue that the rates that counsel charged their clients in the present case would be even more probative evidence of what plaintiffs are due under the Clayton Act. Plaintiffs have not disclosed this information.

9. Based on the evidence in their matrices, plaintiffs seek the following fee awards: Mr. Yablonski (lead counsel), $325 per hour; Mr. Both, $275 per hour; Mr. Edelman, $275 per hour; Mr. Colwell, $150 per hour; Mr. Moser, $105 per hour; Mr. Kaler, $100 per hour; paralegal Mr. Cohen, $45 per hour; law clerk Mr. Moser, $85 per hour.

10. Attempting to establish the first prong, plaintiffs argue that enforcing the antitrust laws serves the public interest, for Congress intended private antitrust plaintiffs to enforce federal legislative policies through their lawsuits. This court does not need to decide whether enforcing the anti-

trust laws through private suits qualifies as a "public interest motive" for the purposes of *SOCM,* because plaintiffs have failed to establish *SOCM's* second prong.

11. Plaintiffs appear to argue that when the rates they claim are less than the rates defendants' counsel charged their clients in the underlying litigation, plaintiffs' claimed rates are presumptively reasonable.

   Defendants, for their part, argue that where plaintiffs' counsel has established billing rates, the rates of other lawyers are irrelevant.

   Both parties' contentions are overstatements. Plaintiffs' contention relies too heavily on a single firm's rate, when plaintiffs should rely on the rates prevailing across the District of Columbia for similar services by similarly experienced lawyers. Defendants' contention forgets that the *Laffey* presumption that counsels' established billing rate is the appropriate award is rebuttable with evidence that other comparable lawyers charge significantly different rates.

"answers to interrogatories" for supporting evidence that their customary fees are below the market rate. Yet nothing in plaintiffs' Answers and Objections to Defendants' Interrogatories (June 11, 1993) indicates that counsel charged certain clients—particularly antitrust clients like the *Brown* class—below-market rates.

Instead of making their required showing that they charge below-market rates, plaintiffs appear to be seeking to circumvent the requirement altogether.[12] In plaintiffs' memoranda, plaintiffs' lead counsel, Mr. Yablonski, surprisingly misconstrues *SOCM*, a case he successfully argued before this Circuit *en banc*. Under Mr. Yablonski's incorrect reading of *SOCM*, "statutory fees in the District of Columbia federal courts should be awarded based upon the rates charged for such services in the community, not by counsel's own billing rates." First Supplemental Decl. of Joseph A. Yablonski, at ¶ 2. Mr. Yablonski's reading omits the crucial limitation of *SOCM:* Counsel may be awarded the prevailing market rates instead of counsels' own billing rates *only* when counsels' own billing rates have been lowered below market value out of noneconomic, public interest motives.[13] *See SOCM*, 857 F.2d at 1524 ("the prevailing market rate method ... shall apply ... to those attorneys who practice pri-

vately and for profit but *at reduced rates* reflecting non-economic goals.") (emphasis added).

This Circuit has made this limitation of *SOCM* clear in *Goos v. National Association of Realtors*, 997 F.2d 1565 (D.C.Cir.1993). In that case, a client, Ms. Goos, relied on *SOCM* in seeking a fee award based not on her lawyer's contractual rate but on a matrix of prevailing market rates. The *Goos* court refused to award the matrix-based rate because "[t]here [was] nothing in the record ... to suggest that Ms. Goos's attorney offered her *a discounted rate* for altruistic reasons." *Goos*, 997 F.2d at 1569 (emphasis added). "Absent evidence of a discount," the *Goos* court refused to disturb the district court's decision not to award the prevailing market rate.[14]

Perhaps plaintiffs have mistakenly assumed that because the *SOCM* court found in 1988 that Mr. Yablonski's billing practices satisfied the second prong of *SOCM*,[15] plaintiffs need not prove that again to this court. Yet evidence that, in 1988, Mr. Yablonski habitually lowered his rates for worthy clients does not perpetually establish that Mr. Yablonski will always keep his rates low for worthy clients. Plaintiffs are still re-

12. In addition to seeking to circumvent this requirement, plaintiffs advance several irrelevant arguments in their attempt to satisfy *SOCM's* second prong. For example, plaintiffs insist that the rates they are seeking in this case are below the market value for their services. (Pls.' Supplemental Mem., at 4.) Yet the second prong of *SOCM* requires plaintiffs to show not that their *requested rates* are below market value, but that *the rates they have habitually charged* certain clients are below market value.

In another unhelpful argument, counsel apparently try to satisfy the second prong by noting that counsel "does not have 'regular' billing rates in the sense that each attorney's services are billed at the same figure to all clients." (Reply Mem., at 11.) This court does not see how the fact that plaintiffs' counsel lack established billing rates establishes that plaintiffs' counsel charge below-market rates.

13. Plaintiffs' misleadingly truncated version of the holding of *SOCM* pervades plaintiffs' pleadings, affidavits, and discovery responses. *See, e.g.*, Reply Mem., at 9 ("In *SOCM*, Circuit Judge Sentelle, writing for the *en banc* court, ... determin[ed] that fee awards should be calculated

based upon prevailing market rates rather than the rates actually charged by the fee applicant."); Yablonski Decl., at ¶ 13 (*SOCM* "held that practitioners such as myself were entitled to recover statutory attorneys' fees based upon the rates customarily charged in Washington, D.C., by attorneys of comparable skill, experience, and reputation."); Answers and Objections to Defs.' Interrogs. and Request for Production of Docs. on Pls.' Application for Attorneys' Fees, filed June 14, 1993, at ¶ 2 ("*SOCM* held that the hourly rate to be applied in the lodestar fee determination is to be based upon prevailing market rates rather than on the hourly rates historically charged by the particular fee claimant.").

14. *Goos*, 997 F.2d at 1569. Pre-*SOCM* opinions—such as *Thompson v. Barrett*, 599 F.Supp. 806, 814 (D.D.C.1984)—that imply that a fee applicant must show nothing more than its counsels' public interest motives cannot survive *Goos*.

15. *See SOCM*, 857 F.2d at 1518 (finding that Mr. Yablonski "charged some clients at hourly rates less than the prevailing average, from motives of subsidizing what [he] perceived to be 'good' clients or clients with good causes.").

quired to show in this case that nothing has materially changed, *i.e.*, that their counsel still charges below-market rates out of public interest motives.

Plaintiffs may file supplemental memoranda to show that their counsel (Mr. Yablonski and the others) continue to altruistically lower their rates below market value for their antitrust clients. However, because plaintiffs have not made this showing in their present pleadings, this court cannot now find that they have satisfied the second prong of *SOCM*. Thus, based on the evidence currently before this court, plaintiffs' first argument that its evidence of prevailing market rates are the best evidence of a reasonable fee award fails.

### 2. Blum

■ Plaintiffs may still invoke their alternative ground to persuade this court to rely on matrices of prevailing market rates as the best evidence of a reasonable fee award. Instead of trying to show that their counsel has a deflated billing history, under this alternative argument plaintiffs contend that their counsel has no billing history at all, deflated or otherwise. If plaintiffs' counsel indeed lack a relevant billing history to serve as the presumptively reasonable fee award, this court would have to determine the "prevailing market rates in the relevant community" based on plaintiffs' matrices and other evidence, and award counsel that as the reasonable hourly rate. *See Blum*, 465 U.S. at 895, 104 S.Ct. at 1547.

There are two variations on this alternative argument. Under the first variation, plaintiffs argue that their counsel lack any billing history because instead of charging clients by the hour, they have earned their fees through "contingent and partially-contingent statutory-fee litigation (wherein payment for services is totally or partially dependent upon success)." Reply Mem., at 11. Contingent or partially contingent fee work—like salaried work—does not produce a billing history. Salaried lawyers who lack billing histories are clearly entitled to fees based on prevailing market rates, *see Blum*, 465 U.S. at 895, 104 S.Ct. at 1547; similarly, plaintiffs argue, lawyers paid only by contingent or partially contingent fees also lack billing histories and thus also deserve fees based on prevailing market rates.

Defendants dispute plaintiffs' claim that their counsel lack an established billing rate. Defendants have produced three successive affidavits of Mr. Yablonski in another case, in which he states that *"[f]ee-paying clients have routinely paid my firm* at ... rates [ranging from $165 to $210 per hour] over the past eighteen months,"[16] that his "currently [sic] *hourly rate for regularly-billed clients* is $250 per hour and has been that figure since July 1991,"[17] and that "[d]uring the past year, *the hourly rates charged by me and members of my firm to fee-paying clients* have increased."[18] Defendants conclude from these statements that Mr. Yablonski and the members of his firm do indeed have established billing rates, and argue that these established billing rates—not plaintiffs' matrices—are the best evidence of what plaintiffs deserve as a reasonable attorney's fee.

This dispute turns upon the presence or absence of an established billing rate for plaintiffs' counsel. Unfortunately, this court lacks enough information to resolve this factual dispute. The evidence before the court does not make clear whether plaintiffs' counsel earn their fees exclusively from contingent fees, or whether they take at least some cases at hourly billing rates. If counsel does take at least some cases at hourly billing rates, this court needs to know how many of

---

16. Yablonski Decl. in *Bidwell v. Garvey* (date unknown), at ¶ 19, Ex. A to Decl. of Jerome D. Sorkin. Emphasis added.

17. Yablonski Decl. in *Bidwell v. Garvey*, dated Feb. 7, 1992, at ¶ 15, Ex. B to Sorkin Decl. Emphasis added. The affidavit also states that "the rates of Mr. Edelman vary, but his commercial rate during the period covered by this supplemental application has been $200 per hour.

Mr. Colwell's rates have gone from $120 in 1990 to $130 in 1991–1992." Yablonski Decl., at ¶ 15.

18. Yablonski Decl. in *Bidwell v. Garvey*, dated Feb. 19, 1993, at ¶ 6, Ex. C to Sorkin Decl. Emphasis added. The affidavit also states that the rates of Mr. Yablonski, Mr. Edelman and Mr. Colwell are $295, $225 and $130 per hour, respectively. Yablonski Decl., at ¶ 6.

those hourly billed cases were antitrust matters. (Evidence of the market value of counsels' non-antitrust work is irrelevant to the determination of the market value of counsels' antitrust work.) Further, this court needs to know the rates counsel charged in any such hourly-billed antitrust cases and whether such rates are within the range of rates charged for antitrust work by similarly experienced lawyers in the District of Columbia. In addition, to resolve the apparent conflict between plaintiffs' claim that their counsel lack an established rate and defendants' evidence to the contrary, this court needs to know whether the rates that defendants have cited are rates that plaintiffs' counsel have actually charged paying clients, rather than rates that plaintiffs' counsel have merely claimed in other attorney's fee applications. To resolve these questions, this court by its own motion orders further discovery and supplemental memoranda on these questions.

On the basis of this supplemental information, this court can resolve plaintiffs' *Blum* argument. There is a second variation of the *Blum* argument which plaintiffs have not pled. In response to defendants' claims that counsel has a billing history—a billing history which should serve as the presumptively reasonable attorney's fee award—plaintiffs might have countered that the billing history that defendants cite is not a "*relevant* billing histor[y]." *Laffey*, 746 F.2d at 24 (emphasis added). Under *Blum*, if there is no relevant billing history, this court would have to rely on plaintiffs' matrices and other evidence to determine the reasonable fee award.

Only a *relevant* billing history serves as the presumptively reasonable rate, because only relevant billing histories are reliable indicators of what counsel might have earned in the market. Suppose that plaintiffs had shown that the billing history cited by defendants records rates that counsel had charged, say, for civil rights matters and not for antitrust matters. There would be no reason to presume that those civil rights rates reflect what counsel might have earned for their work in this case in the more lucrative antitrust market. Fixing fee awards for new and lucrative antitrust work at rates earned for earlier, low-paid, civil rights work would improperly award counsel a rate lower than the market would provide.

### 3. Parties' Discovery Requests

■ Both plaintiffs and defendants have sought to compel discovery of rate information from each other. Because both parties have sought to compel discovery without first obtaining court permission to conduct discovery,[19] both motions to compel will be denied. *See Nat'l Ass'n of Concerned Veterans v. Sec. of Defense*, 675 F.2d 1319, 1338 (D.C.Cir. 1982) (Tamm, J., concurring) (parties opposing fee applications "must file with the district court a formal request for discovery."). *See also id.* at 1329.

Treating defendants' motion to compel and plaintiffs' motion for leave to conduct discovery as proper formal discovery requests, this court shall grant defendants' request and deny plaintiffs' request. Defendants' request to discover whether and at what rates plaintiffs' counsel were paid by the NFLPA simply discovers a subset of what this court has already ordered discovered by its own motion: whether and at what rates counsel has been paid by their clients for antitrust work.

■ By contrast, plaintiffs' request to discover the hours and hourly rates of all defendants' lawyers and paraprofessionals in this case would produce only very marginal evidence of what counsel could earn in the market. Defendants' counsel is just one of many District of Columbia law firms, and their particular rates are not especially probative of the rates prevailing among the scores of firms in this city.

Because the supplemental discovery and memoranda ordered in this opinion should suffice, defendants' contingent request for an

---

19. Plaintiffs had properly requested leave to conduct discovery before filing their motion to compel, but this court had not yet ruled on plaintiffs' discovery request when plaintiffs filed their motion to compel. Defendants never filed a formal request to conduct discovery, although they did ask this court to treat their motion for extension of time as such a request. (Reply Mem. in Support of Defs.' Mot. for Extension of Time, at 2.)

evidentiary hearing on this fee application is denied.

### 4. Conclusion

The court will postpone determining the rates reasonable in this case until it has the opportunity to review the additional discovery ordered above. A separate order for discovery shall issue this date.

### B. Reasonable Number of Hours

Plaintiffs seek compensation for the thousands of hours their counsel spent litigating *Brown.* Defendants concede liability generally, but counter that plaintiffs' counsel staffed this case so inefficiently that plaintiffs are entitled to compensation for only 80 percent of their claimed hours.

■ Unproductive or duplicative time, or time spent by high-priced senior lawyers on tasks that junior lawyers could have performed more economically,' should be stricken from a "reasonable" attorney's fee award. *See, e.g., Oklahoma Aerotronics, Inc. v. United States,* 943 F.2d 1344, 1346–47 (D.C.Cir. 1991); *Copeland v. Marshall,* 641 F.2d 880, 891, 903 (D.C.Cir.1980) *(en banc); In re Fine Paper Antitrust Litigation,* 751 F.2d 562, 591–93 (3d Cir.1984). The touchstone is what a reasonable client would agree to pay counsel under the circumstances. *See Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983) (" 'Hours that are not properly billed to one's *client* are not properly billed to one's *adversary.'* ") (quoting *Copeland,* 641 F.2d at 891). Defendants argue that a reasonable client would not have paid plaintiffs' lead counsel, Mr. Yablonski, and plaintiffs' other lawyers for more than 80 percent of all the time they spent on this case.

### 1. Yablonski, Edelman, and Colwell

Defendants argue that Mr. Yablonski—a highly skilled, high priced attorney—should not be awarded high fees for performing spadework customarily assigned to low-fee, junior lawyers. "A Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn." *Ursic v. Bethlehem Mines,* 719 F.2d 670, 677 (3d Cir.1983). Defendants cite two classes of work that Mr. Yablonski and other senior lawyers performed that could have been performed at lower cost by more junior associates: factual and legal research, and clerical work.[20]

#### a. Research

■ Defendants argue that no reasonable client would agree to pay Mr. Yablonski to perform personally all the research in this complicated, years-long case. In this case, Mr. Yablonski himself did the library research, drafted the motions and briefs and discovery requests, and reviewed thousands of pages of discovered documents.[21] Defendants argue that Mr. Yablonski could have accomplished all this more efficiently if he had delegated these chores to low-fee junior associates, familiarizing himself with the facts through review and analysis of junior associates' research.

However, defendants' proposed method of reviewing and analyzing subordinates' work may be inefficient itself: To be thoroughly prepared, he would have to read not only the junior lawyer's digest but the underlying factual record. Further, the reasonable client might understand that Mr. Yablonski's litigation strategy of concentrating in a single lawyer responsibility for handling almost every task in the case—including the less glamourous work, say, of conducting routine depositions—was a wise tactical decision that delivered success on the merits and a sizeable jury verdict. For example, due to this centralizing strategy, "class counsel was able to effectively cross-examine and to develop evidence favorable to Plaintiffs' case through Charlie Casserly, George Young and Tim Rooney because of counsel's intimate familiarity with the claims and backgrounds of all

---

20. Defendants also contest liability for work not directly related to *Brown.* Time that Mr. Yablonski spent recruiting paralegals and lawyers for his firm, even to work on *Brown,* is not compensable. *See* Time Entries November 5, 1991 and May 22, 1992.

21. For example, Mr. Yablonski spent up to nine hours reviewing developmental squad contracts. *See* Time Entries May 22, 23, 24, 25, 29, 1990.

of the class members and other players [whom] the Clubs employed." Reply Mem., at 16 n. 13.

Defendants also argue that Mr. Edelman, one of plaintiffs' senior litigators, should not have performed tasks that could have been more economically accomplished by more junior lawyers, such as spending eight days digesting depositions. Defendants also argue that Mr. Colwell, the Yablonski firm's senior associate, billed from one-half to two-thirds of his time in this case to the reviewing and proofing of documents, tasks that could have been performed more cheaply by a younger lawyer. Yet defendants' argument would force all firms, large and small, to staff cases as deeply as big District of Columbia law firms do. Small firms need not—economically, often they cannot—behave as if they had the human resources of firms employing many more lawyers.

Plaintiffs are entitled to compensation for Mr. Yablonski's, Mr. Edelman's, and Mr. Colwell's time, but at no more than the prevailing market rate. Although a reasonable client might agree that Mr. Yablonski's concentrated strategy was worth its cost and that small firm billing practices are not unreasonable, it is not clear that a reasonable client would pay Mr. Yablonski, Mr. Edelman, or Mr. Colwell for all their labor—expended on high-skill and low-skill tasks alike—at the rates that similarly experienced lawyers appear to collect for their attention solely to matters demanding skilled expertise. For example, the rate Mr. Yablonski seeks, $325 per hour, is the rate plaintiffs' matrices indicate is earned by District of Columbia senior lawyers, presumably solely for the work they do that demands all of their expertise and experience. Defendants have planted some doubt that lawyers in the firms surveyed in plaintiffs' matrices would earn $325 per hour if they performed such low-skill (albeit important) tasks such as performing all factual and legal research personally.

Yet defendants must do more than cast doubt upon the credibility of plaintiffs' evidence. "Just as the applicant cannot submit a conclusory application, an opposing party does not meet his burden merely by asserting broad challenges to the application." *Concerned Veterans*, 675 F.2d at 1338 (Tamm, J., concurring). Plaintiffs shall be compensated for all the time analyzed in this section, although perhaps not at the rates plaintiffs have claimed. In their supplemental memorandum, defendants may provide evidence indicating that plaintiffs deserve lower hourly rates because of the mixed tasks their counsel performed in this case, and plaintiffs may provide evidence to the contrary.

### b. Clerical work

In a similar vein, defendants argue that no reasonable client would have paid for a high-fee senior lawyer like Mr. Yablonski to perform some of many clerical tasks he performed in this case. In some instances, defendants are correct that Mr. Yablonski concerned himself with administrative minutiae, spending fourteen days personally organizing and reviewing player photographs in player trading cards [22] and arranging for a van to shuttle plaintiffs' attorneys to court and back during trial.[23] For time spent performing these wholly clerical tasks, awarding Mr. Yablonski's high hourly rate would be overcompensation. The appropriate level of compensation, of course, is the prevailing market rate, and where senior litigators perform clerical tasks this court will award no more than the market rate that that work commands. *See Fine Paper*, 751 F.2d at 591–92 (affirming district courts' authority to reduce rates of partners to associates' rates when partners perform associate or paralegal tasks). In their supplemental memoranda, the parties shall have the opportunity to

---

22. *See* Time Entries June 11, June 12, June 13, June 17, June 22, June 23, June 26, June 27, June 29, June 30, July 2, July 3, July 7, and August 12, 1992. Concededly, the time entries show that Mr. Yablonski properly spent some of this time reviewing the photographs' production. Yet the time he billed to this project stretched over an entire summer, and the occasional time entry reading "review and log-in photos" (Time Entry July 7, 1992) raises the suspicion that in this instance, Mr. Yablonski involved himself too closely with clerical tasks.

23. *See* Time Entry September 17, 1992.

proffer prevailing market rates for the performance of such clerical legal work.

By contrast, in contesting liability for time Mr. Yablonski spent personally filing the complaint at the courthouse,[24] overseeing the assembly of documents for service and filing,[25] and overseeing the collection of players' addresses and supervising the mailing and return of notices,[26] defendants wrongly criticize plaintiffs' counsel for properly paying close attention to this case. This court greatly appreciates Mr. Yablonski's close management of the case generally and of the documents he submitted to this court particularly. This court is quite happy to see counsel themselves, not bumbling, know-nothing messengers, file those documents with the clerk of the court.

### 2. Law Clerks/Paralegals: Moser and Kaler

■ Defendants argue that Mr. Moser and Mr. Kaler were functionally no more than paralegals, even though Mr. Yablonski hired Mr. Moser as a "law clerk" and promoted him after the partial summary judgment to "associate." Defendants note—and plaintiffs do not refute—that in April 1992, most of their time was expended on tasks like updating class members' address list, copying, filing and logging in responses to class member surveys, and recalculating numbers in damages charts.[27] Yet review of plaintiffs' time sheets shows that although Messrs. Moser and Kaler did spend considerable time on such tasks, in the months before trial Mr. Moser also prepared witnesses for their direct examination [28] and prepared a memorandum on workers' compensation payments,[29] and Mr. Kaler analyzed defendants' exhibits [30] and prepared witnesses.[31] Customarily young associates, not paralegals, perform these tasks along with some of the less

skilled work defendants have cited. These arguments of defendants do not persuade this court to reduce the hours or rates of Messrs. Moser and Kaler.

### 3. Time During Trial

■ Defendants lastly object to plaintiffs' claim for the 10–15 hours per day logged by Messrs. Colwell, Moser, and Kaler for sitting silently at counsel table during the trial, occasionally locating exhibits or operating the overhead projector. This was unproductive time, in defendants' view, and should not be compensated. See Copeland, 641 F.2d at 891. The reasonable client would have questioned the need for more than two lawyers at counsel table during trial, and would only very rarely consent to paying for three. Plaintiffs' counsel must absorb the expense of seating Messrs. Colwell, Moser, and Kaler at counsel table, perhaps as a cost of training and encouraging their lawyers and clerks.

### III. COSTS

Plaintiffs request compensation for several out-of-pocket litigation expenses. Plaintiffs claim $139,970.58 in initial expenses, and $2,426.93 in additional expenses incurred after the filing of plaintiffs' application for fees.[32]

Under § 4 of the Clayton Act, plaintiffs are entitled to "the cost of suit, including a reasonable attorney's fee." In West Virginia University Hospitals, Inc. v. Casey, 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991), the Supreme Court held that an applicant seeking fees under § 1988—which awards "a reasonable attorney's fee as part of the costs"— may recover only those out-of-pocket expenses that are either customary elements of an "attorney's fee," or are expressly shifted by statute. See id., 499 U.S. at 86–88, 111 S.Ct. at 1141. Because of the close similarity

---

**24.** See Time Entry May 9, 1990.

**25.** See Time Entry May 9, 1990.

**26.** See Time Entry July 3, 5, 6, 18, 26, and 27, 1990.

**27.** See Time Entries April 13–16, 1992; April 24—May 8, May 11—May 18, 1992; April 17—20, 1992.

**28.** See Time Entry of August 20, 1992.

**29.** See Time Entry of August 26, 1992.

**30.** See Time Entry of August 27, 1992.

**31.** See Time Entry of September 18, 1992.

**32.** Plaintiffs do not seek expert witness fees.

between the language of § 1988 and of § 4 of the Clayton Act, this court will apply *West Virginia*'s strictures to this case.

### A. Costs Traditionally Included in an "Attorney's Fee"

■ Plaintiffs' out-of-pocket costs for telephone, telecopier, air and local couriers, postage, photocopying, WESTLAW research, secretarial overtime, and counsels' travel expenses are routinely billed to fee-paying clients, and thus are all compensable as part of a reasonable attorney's fee. *See Jenkins*, 491 U.S. at 285, 109 S.Ct. at 2470 (including the cost of secretaries and messengers in a reasonable attorney's fee); *In re Oliver L. North (Shultz Fee Application)*, 8 F.3d 847, 851–52 (D.C.Cir.1993) (per curiam) (including travel and travel-related food and lodging expenses as part of a "reasonable attorney's fee," if expenses are reasonable and well-documented); *In the Matter of Continental Illinois Securities Litigation*, 962 F.2d 566, 570 (7th Cir.1992) (awarding reasonably incurred computer-assisted research expenses as part of an attorney's fee); *Northcross v. Board of Ed. of Memphis City Schools*, 611 F.2d 624, 639 (6th Cir.1979), *cert. denied*, 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980) (permitting recovery of costs of photocopying, travel, and telephone calls as elements of an attorney's fee). Defendants have conceded that the amounts claimed for each of these expenses are reasonable. (Defs.' Opp'n, at 4 n. 3.)

■ Plaintiffs have also claimed the cost of hiring computer consultants and a computer programmer "to perform various analysis on the Player–Profile data produced by the NFL in both hard-copy and computer disc form," to analyze the data, and to help input the data. This expense seems similar to the expense of hiring a paralegal to order and analyze documents, an expense that is clearly considered part of an attorney's fee.[33] The only difference appears to be that the vastly greater number of documents in the present case demands a computer's help, not a paralegal's help, to sort them properly. Because the expense of computer assistance appears to be an element of an attorney's fee, and because defendants have conceded that the amount claimed is reasonable (Defs.' Opp'n, at 4 n. 3), plaintiffs may recover the expenses of their computer consultants and programmer.

### B. Costs Shifted by § 1920

#### 1. Transcripts

■ Plaintiffs seek $17,223.50 in court reporters' fees for transcripts. The cost of transcripts is compensable under § 1920(2) only if the transcript is "necessarily obtained for use in the case," and it appears that in the present case, the transcripts were indeed "necessarily obtained." This was a long and complicated trial, and the court can readily understand counsels' need for transcripts in preparing for this case. Moreover, defendants do not argue that these expenditures were not necessary. (Defs.' Opp'n, at 4 n. 3.) Accordingly, plaintiffs may recover their transcript costs.

#### 2. Defendants' Witnesses Expenses

■ Plaintiffs seek $1,764.00 in costs incurred by defendants' witnesses. Section 1920(3) permits the taxing of "fees and disbursements for ... witnesses." Costs awarded under this subsection are governed by 28 U.S.C. § 1821, which shifts to defendants each witness's travel expenses, subsistence expenses, and a $40 per diem fee for each witness.[34] Although plaintiffs might have had a plausible claim to recover costs they incurred for defendants' witnesses,[35] plaintiffs have not submitted enough evidence for this court to grant them these costs. Plaintiffs have not submitted the number of days that these witnesses were in court, their travel expenses, or their subsis-

---

**33.** *See Jenkins*, 491 U.S. at 285, 109 S.Ct. at 2470 (taking as "self-evident [the] proposition that the 'reasonable attorney's fee' provided for by statute should compensate the work of paralegals").

**34.** *See* 10 Wright & Miller, *Federal Practice and Procedure* § 2678, at 374 (1983).

**35.** By contrast, plaintiffs may not recover the amounts that their class members expended acting as witnesses. Class members who serve as witnesses may not collect these expenses under § 1821. *See id.* § 2678, at 376.

tence expenses, or why *plaintiffs* would have incurred any costs for *defense* witnesses. Absent an adequately well-documented bill of costs, this court may not award such expenses.

### 3. Filing Fees

As a routine court cost, filing fees are clearly taxable. Plaintiffs may recover this cost.

### 4. Litigation Graphics and Supplies

■ Plaintiffs also seek compensation for almost $20,000 in "litigation graphics" and "litigation supplies." These costs are compensable under § 1920(4) if "necessarily obtained for use in the case." In the present case, plaintiffs' charts (blow-ups, flip-charts, and page-sized color exhibits) were necessary to plaintiffs' presentation of their case to the jury. Defendants concede that the amount plaintiffs spent on these charts is reasonable. (Defs.' Opp'n, at 4 n. 3.) Thus plaintiffs may recover these costs.

### 5. "Investigation and Data Search"

Plaintiffs have claimed $6,275.78 in "investigation and data search" costs, but it is not clear from their memoranda what this cost covers. Without knowing what the cost is for, it is impossible to know whether this court has any authority to shift it. Accordingly, plaintiffs shall explain this expense in their supplemental submissions to this court.

## IV. FEES FOR FEE LITIGATION

■ Plaintiffs claim $21,762.50 in fees [36] associated with this fee litigation. Plaintiffs are entitled to compensation from defendants at reasonable rates for all hours reasonably expended on this fee petition. *See, e.g., Copeland,* 641 F.2d at 896, 901; *Sierra Club v. E.P.A.,* 769 F.2d 796, 811 (D.C.Cir.1985); *Environmental Defense Fund v. E.P.A.,* 672 F.2d 42, 62 (D.C.Cir.1982).

Plaintiffs may collect reasonable hourly rates for all of their work, and all of their costs, associated with this fee litigation that they claimed in their original petition as sup-

plemented by Plaintiffs' Supplemental Memorandum in Support of their Application for Attorney's Fees and Litigation Expenses. Defendants have made no objection to any of these, and their silence leads this court to believe that plaintiffs' claim is justified by some factor apparent to the parties. *Cf. Sierra Club,* 769 F.2d at 812. Therefore this court will presume that plaintiffs' claimed hours and costs are reasonable and thus recoverable under Section 4.

As to the fees and costs associated with this fee litigation that plaintiffs petitioned for in their Reply Memorandum, defendants raise two objections. First, they object that less than eight hours of Mr. Yablonski's billing—time he spent correcting errors they made in their original application [37]—should be disallowed because plaintiffs caused the delay themselves by making errors in the first place. Because the time entries for those days include work done on subjects other than this correction, it is difficult for this court to know how much time to strike. Estimating roughly, this court will strike 50 percent of the challenged eight hours from plaintiffs' award. *See Copeland,* 641 F.2d at 903 (permitting a district court that detects some duplicative time to reduce the claimed number of hours by some fraction "without performing an item-by-item accounting").

Defendants also urge that the supplemental request be discounted because plaintiffs' failure to disclose "necessary evidence" in their fee application has lengthened and complicated this fee litigation. It is true that this case has become drawn out because this court does not know whether plaintiffs' counsel earn their fees exclusively from contingent fees, whether any hourly billed cases that plaintiffs' counsel have taken have involved antitrust disputes, and whether the rates that defendants claim plaintiffs' counsel have sought in other cases are rates counsel have charged to paying clients or have claimed in other attorney's fee applications. *See supra,* (II)(A)(2). Nevertheless, the court will not strike plaintiffs' supplemental request, and plaintiffs may file a supplemen-

---

**36.** The costs associated with litigating this fee petition are included *supra,* (III).

**37.** *See* Time Entries of June 17 and June 18, 1993.

tal application for fees and costs incurred in this fee litigation since the filing of the Reply Memorandum.

## V. *Current Rates*

■ Finally, plaintiffs· request. that all their time be compensated at current, rather than historical, rates. For example, plaintiffs seek compensation for the time of Mr. Yablonski at $325 per hour—his 1993 rate—even for work he performed in previous years when his rate was lower.

■ Although courts frequently award Clayton Act fee applicants historical rates,[38] district courts clearly have the authority to grant fee applicants current instead of historical rates in order to compensate for a delay in payment. *See Jenkins,* 491 U.S. at 283–84, 109 S.Ct. at 2469. In the present case, although it is unclear whether plaintiffs received any payment during the course of the *Brown* litigation, it appears from the record that they have received no interim settlement since the close of the *Brown* litigation. Plaintiffs' counsel began working on this case in 1990, and to compensate for the three-year delay in payment for their services, this court will award them current market rates.

## VI. CONCLUSION

Upon receipt and consideration of supplemental memoranda, this court will calculate a final fee award.

A separate order shall issue this date.

### ORDER

This matter ·comes before this court on· plaintiffs' motion for an award of attorney's fees under Section 4 of the Clayton Act, 15 U.S.C. § 15(a). Having found that the pleadings and evidence of the parties do not provide sufficient information· for this court to determine the reasonable hourly rate of plaintiffs' counsel, this court orders the following discovery:

---

38. *See, e.g., Ohio–Sealy Mattress Mfg. Co. v. Sealy Inc.,* 776 F.2d 646, 653–54 (7th Cir.1985); *Weiss v. York Hospital,* 628 F.Supp. 1392, 1408–11 (N.D.Pa.1986).

## I. *Parties' Discovery Requests*

A. Defendants' discovery request is hereby granted to the extent indicated herein. Plaintiffs shall within twenty days of the date of this order serve upon defendants evidence disclosing (1) any fee agreement between plaintiffs and/or their counsel and the NFLPA concerning this case and (2) the amounts paid by the NFLPA to plaintiffs' counsel for this case, the dates paid, and the time charges and hourly rates upon which those payments were based.

B. Plaintiffs' request to discover the hours and hourly rates of all defendants' lawyers and paraprofessionals in this case is hereby denied.

C. Defendants' contingent request for an evidentiary hearing on this fee application is hereby denied. Defendants' motion for an extension of time in which to file their opposition to the fee application is denied as moot.

## II. *Sua Sponte Discovery*

This court by its own motion orders discovery of the following items:

A. Plaintiffs shall have twenty days from the date of this order to provide evidence as to

1. whether their counsel[1] continue to altruistically lower their rates below market value for their antitrust clients.

2. how many of their hourly billed cases have been antitrust matters.

3. the rates counsel have charged in any such hourly billed antitrust cases (assuming that counsel. take some antitrust cases at hourly billing .rates). · Plaintiffs shall also provide evidence as to whether those rates are within the range of rates charged for antitrust work by similarly experienced lawyers in the District of Columbia.

4. whether the rates that defendants have cited (Defs.' Opp'n, at 12) are rates that plaintiffs' counsel have actually charged paying clients, or are rates that plaintiffs' coun-

---

1. Throughout this order, the term "counsel" refers to all. of plaintiffs' lawyers who worked on the *Brown* litigation.

sel have claimed in other attorney's fee applications.

B. By January 10, 1994, plaintiffs may file a supplemental memorandum incorporating this new information. In this supplemental memorandum, plaintiffs shall also explain their claimed $6,275.78 expense for "investigation and data search."

C. By January 20, 1994, defendants may file a supplemental opposition memorandum responding to plaintiffs' supplemental memorandum. In their opposition, defendants shall

1. indicate whether plaintiffs deserve lower hourly rates for some of the mixed tasks plaintiffs' counsel have performed in this case.

2. indicate whether there is a prevailing market rate for Mr. Yablonski's performance of clerical legal work.

D. By January 27, 1994, plaintiffs may file a supplemental reply memorandum.

SO ORDERED.