Anthony **BROWN**, et al., Plaintiffs,

v.

**PRO FOOTBALL, INC., d/b/a Washington Redskins, et al., Defendants.**

**Civ. A. No. 90–1071 (RCL).**

United States District Court, D. Columbia.

March 1, 1994.

Joseph A. Yablonski, Yablonski, Both & Edelman, Washington, DC, for plaintiffs.

Peter J. Nickles, Covington & Burling, Washington, DC, for defendants.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This case comes before this court on plaintiffs' motion for reconsideration of this court's order of December 13, 1993 [1] and on the parties' supplemental briefings requested by that order.

Having considered plaintiffs' motion to reconsider, defendants' opposition, and plaintiffs' reply, the motion to reconsider shall be granted in part.

Having considered plaintiffs' supplemental memorandum on their request for fees and

---

1. *Brown v. Pro Football, Inc.,* 839 F.Supp. 905 (D.D.C.1993) ["Mem.Op."].

costs, defendants' response, and plaintiffs' reply, and the entire record herein, this court will award plaintiffs $1,744,578.41 in attorney's fees and litigation costs.

## I. MOTION TO RECONSIDER

Plaintiffs ask this court to reconsider its refusal to allow expenses for defendants' witnesses and its refusal to allow compensation for the trial time of three of plaintiffs' lawyers. Each of these two decisions is reconsidered in turn.

### A. Defendants' Witnesses' Costs

■ Plaintiffs request reconsideration of this court's refusal to tax the expenses of defendants' witnesses that plaintiffs incurred. (Mem. Op. 839 F.Supp. 905, 916-17.) Plaintiffs did not explain in their original pleadings why they were paying the costs of defendants' witnesses' in the first place. Nor did plaintiffs submit statements of defendants' witnesses' expenses or the number of days the witnesses attended proceedings in this case. Without this information, this court could not award plaintiffs the expenses they sought.

In their motion for reconsideration, plaintiffs have corrected these failings. They have explained that they paid the expenses of defendants' witnesses as part of a cost-saving agreement to bring witnesses to counsel, rather than vice-versa, for depositions. Defendants agreed to produce four witnesses for plaintiffs' depositions in Washington, D.C., and plaintiffs agreed to pay their travel costs and a per diem fee for each witness. (Pls.' Mot. for Recons. at ¶ 1.) Plaintiffs have submitted a copy of an August 17, 1992, letter from plaintiffs' counsel to defendants' counsel requesting defendants' witnesses'

fees and expenses as follows (Pls.' Mot. for Recons., Ex. A):

| Witness | Transportation Expenses | Per Diem | Boot[2] |
|---|---|---|---|
| Ruocco | $ 280.00 | $ 40.00 | $110.00 |
| Bussert | $ 280.00 | $ 40.00 | $110.00 |
| Sullivan | $ 261.00 | $ 40.00 | $110.00 |
| Young | $ 343.00 | $ 40.00 | $110.00 |
| Total: | $1,164.00 | $160.00 | $440.00 |

Plaintiffs paid the total—$1,764.00—to defendants the next day. (Pls.' Mot. for Recons., Ex. B.)

The parties' economical agreement is an impressive example of cooperation between parties to keep litigation costs down, especially when the party that is incurring the costs anticipates thrusting the costs on another party under a fee-shifting statute. More arrangements like this in future cases could make litigation more efficient and cost-shifting more fair.

■ Having discovered what costs are included in plaintiffs' request, this court will award plaintiffs their requested $1,764.00. The per diem costs are within the $40 statutory cap. 28 U.S.C. § 1821(b). The transportation costs—which are reasonable, well-documented with travel invoices (Pls.' Mot. for Recons., Ex. A), and uncontested—shall also be allowed. 28 U.S.C. § 1821(c) (taxing actual, reasonable travel costs). The $440 boot that defendants contributed to equalize the bargain encouraged this highly commendable cost-saving agreement between the parties, and it shall also be allowed.

■ Concededly, boot is not one of the enumerated costs that Congress has authorized this court to shift under 28 U.S.C. § 1821, nor is boot one of the traditional costs of litigation shifted under the Clayton Act. Traditionally, after all, opposing counsel have tried to ruin each other with escalating legal costs, not to cooperate in keeping

---

2. The parties' agreement, read literally, asks this court to tax $150 per diem per witness. Yet 28 U.S.C. § 1821(b) permits courts to shift no more than $40 daily for such "per diem" costs. See 10 Wright, Miller & Kane, *Federal Practice and Procedure* § 2678, at 386 (1983).

Construing the parties' agreement so as not to violate the statute, this court will assume that the parties agreed to convey only $40 per day per witness in "per diem" costs and that the remainder—$110 per day per witness—is boot.

This construction makes sense, since defendants must have been glad to pay $440 in boot to get plaintiffs to agree to this cost-saving arrangement. The arrangement spared defendants from potential liability for the hundreds of dollars in extra travel costs that plaintiffs would have incurred had their plaintiffs' counsel traveled to the witnesses.

costs down. However, in authorizing the shifting of traditional costs, Congress could not have meant that only the wasteful and expensive costs that counsel traditionally incur may be shifted, and that the small boot designed to encourage innovative cost-saving arrangements of enlightened parties may not be shifted. Such a rule might have the perverse effect of discouraging efficient arrangements, and Congress could not have intended that.

### B. Trial Attendance

■ Plaintiffs also request reconsideration of this court's refusal to shift the fees of three attorneys who sat at counsel table during the trial. The Order of December 13, 1993 permitted recovery for the fees of plaintiffs' lead counsel—Messrs. Yablonski, Edelman, and Both—for their time at trial and in trial preparation, but disallowed the fees for the trial time of lawyers Colwell, Moser, and Kaler. (Mem. Op. at 915.)

Plaintiffs' original fee application pleading left the court with the impression that Messrs. Colwell, Moser, and Kaler attended the trial either out of curiosity or for training, and that they performed only a few minimal clerical chores during trial.[3] In their supplemental declaration accompanying their motion to reconsider, however, plaintiffs have detailed the important duties that Messrs. Colwell, Moser, and Kaler performed during trial.[4] Mr. Moser, for example, "access[ed] several thousand pages of Plaintiffs' exhibits, in hard copy form, on transparencies and in blown-up form and coordinat[ed] those exhibits with the witness who was testifying [and] worked with the Court reporter in the preparation of, delivery, and review of

daily transcripts." Mr. Kaler "had responsibilities relating principally to the designation and reading of depositions." Mr. Colwell "had the principal responsibility for jury instructions and for coordinating ongoing trial developments with the testimony of Dr. Hamilton." Messrs. Moser's and Kaler's presence at trial "assured a smooth, orderly presentation of proof" in a case involving about fifteen witnesses. (Supplemental Decl. of Joseph A. Yablonski at ¶ 24.) Defendants contest none of these characterizations of the work of these three.

These detailed and unchallenged task descriptions reveal that contrary to the court's original impression, Messrs. Colwell, Moser, and Kaler attended trial to keep a complex case running smoothly, not merely to observe or to satisfy curiosity. Yet they did not do enough to warrant the full rates of lawyers for their time at trial, and plaintiffs have not argued that their performance of such tasks was enriched by their special knowledge of the case. Accordingly, they shall be compensated for only seventy-five percent of their time at trial. See, e.g., Action on Smoking and Health v. C.A.B., 724 F.2d 211, 222–23 (D.C.Cir.1984) ["ASH"] (reducing hours by twenty-five percent).

■ The new facts that plaintiffs have provided in their motion for reconsideration should have been included in their original fee application. Making piecemeal additions to the record in reconsideration motions is not the proper way to litigate. The only reason the court is willing to consider such late additions in this case is that the court had already agreed to consider supplemental memoranda on other issues. Absent such

---

**3.** Plaintiffs' application for attorney's fees did not make a strong case for compensation for the trial time of Messrs. Colwell, Moser, and Kaler. After defendants challenged the need to pay for their time at trial, plaintiffs' principal response was a conclusory retort that defendants' argument was "crude and offensive." (Pls.' Reply Mem. in Support of Application for Attorney's Fees and Litigation Expenses at 17.) Later, in a supplemental memorandum, plaintiffs did mention in a footnote that "attorneys other than Mr. Yablonski" sitting at counsel table provided important cross-examination questions. (Pls.' Supplemental Memorandum in Support of Application for Attorney's Fees and Litigation Costs at 6 n. 3.)

**4.** In their motion to reconsider, plaintiffs also make an alternative argument that because defendants had four to seven lawyers in the courtroom during the trial—three at counsel table and several in the gallery—plaintiffs should be able to bill for the fees of their five lawyers at plaintiffs' table. Yet the billing practice of defendants' counsel is not directly relevant. What matters is what a reasonable client would pay, not what any particular client—including defendants in this case—actually paid.

very exceptional circumstances, such piecemeal litigation will not be tolerated.

## II. SUPPLEMENTAL MEMORANDA

The Order of December 13, 1993 gave the parties the opportunity to conduct further discovery and to file supplemental memoranda in order to help this court determine the reasonable hourly rate to which plaintiffs' counsel are entitled under Section 4 of the Clayton Act, 15 U.S.C. § 15(a), the number of hours for which plaintiffs should be ·compensated, and whether plaintiffs should be compensated for investigation costs. Each of these issues is considered below in light of the parties' well-argued supplemental briefs.

### A. Hourly Rates

■ The keystone issue of this case is whether plaintiffs' counsel have met the two-pronged test of *Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516 (D.C.Cir.1988) (*en banc*) ["*SOCM*"]. Under *SOCM*, plaintiffs must show first, that the work their counsel have done in this case promotes the public interest, and second, that their counsel have charged below-market rates which reflect counsels' non-econom-

ic goals. If plaintiffs do not meet both of these tests, they may recover nothing more than the rates that their counsel have charged them. If plaintiffs do meet both of these tests, they are entitled to the prevailing market rates for the legal work their counsel performed.

■ The original pleadings did not provide enough information for this court to determine whether plaintiffs had satisfied the second prong. The supplemental memoranda, which are supported with updated and extensive documentation, have provided a wealth of information to help the court.[5] Having reviewed and analyzed the matrices, affidavits, and surveys of the supplemental memoranda, this court concludes that plaintiffs' counsel generally received below-market rates.

[10] The rates that plaintiffs' lead counsel, Mr. Joseph A. Yablonski, has charged plaintiffs in this case [6] are less than the *Laffey* matrix's rates [7] and the U.S. Attorney's fee matrix rates.[8] Throughout the *Brown* litigation, he charged plaintiffs less than the market rates recorded in the two matrices.[9]

---

5. In their supplemental memoranda, plaintiffs rely on the rationale of *SOCM*, not *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), to claim their fees. (Mem. Op. 839 F.Supp. at 909–913.) That is, plaintiffs have opted to argue in their supplemental memoranda that they are entitled to market· rates instead of their actual billing rate because their billing history is deflated, not because they lack any billing history at all. (Pls.' Supp.Mem. at 11 n. 10 ("Plaintiffs' attorneys have not asserted that we did not have billing rates during the pendency of this litigation."))

6. Defendants emphasize that plaintiffs' counsel charged plaintiffs in this case as much as or more than they have charged other clients. (Defs.' Resp. to Pls.' Supp.Mem. at 6, 8.) Even if true, this does not disprove that the rates the *Brown* plaintiffs paid were still below market.

7. The *Laffey* fee matrix was developed in *Laffey v. Northwest Airlines, Inc.*, 572 F.Supp. 354, 371–75 (D.D.C.1983), *aff'd*, 746 F.2d 4 (D.C.Cir.1984), *rev'd in part on other grounds, SOCM*. The *Laffey* matrix is set forth in Appendix A of *Covington v. District of Columbia*, 839 F.Supp. 894, 898 (D.D.C.1993).

The *Laffey* matrix received a degree of approval from the Court of Appeals and has been em-

ployed by six other District of Columbia district judges. *See Covington*, No. 87–2658, Mem.Op. at 9 nn. 9, 10 (collecting cases).

8. The U.S. Attorney's fee matrix was compiled by the U.S. Attorney's Office for the District of Columbia. This matrix, updated for 1993–94, is set forth as Appendix A to this memorandum opinion.

9. In 1989–90, Mr. Yablonski received $200–210 per hour from plaintiffs for his work in this case and in other non-antitrust matters. (Pls.' Supp. Mem. at 4.) For work performed in this time period by lawyers of twenty years' experience or more, the U.S. Attorney's fee matrix recorded the prevailing market rate as $260 per hour, and the *Laffey* fee matrix recorded the prevailing market rate as more than $265.

In 1990–91, Mr. Yablonski received $210 per hour. (Pls.' Supp.Mem. at 4.) For work performed in this time period by lawyers of twenty years' experience or more, the U.S. Attorney's fee matrix recorded the prevailing market rate as $275 per hour, and the *Laffey* fee matrix recorded the prevailing market rate as more than $265. In 1991–92, Mr. Yablonski received $220–250 per hour. (Pls.' Supp.Mem. at 4.) For work performed in this time period by lawyers of

It is true that other information indicates that Mr. Yablonski's rates are not lower than the market rates, but squarely within the range of market rates. Newspaper surveys submitted as evidence show a very broad range of rates that lawyers of Mr. Yablonski's experience charge in the District of Columbia. The hourly rates surveyed in the *Legal Times* and the *National Law Journal* span hundreds of dollars per hour, and unsurprisingly Mr. Yablonski's rates fit within that span. For example, the *Legal Times* records that in 1990–91, D.C. lawyers charged from $165 to $420 per hour, a span of $255. (Fourth Supp.Decl. of Yablonski, Ex. 6.) Mr. Yablonski's $210 rate for that year fits easily within that expansive span, even though it is less than the $275 that the U.S. Attorney's fee matrix would award for that year. If the court were to rely on these newspapers' fee surveys and find that Mr. Yablonski's rates fit within their rate ranges, plaintiffs would fail the second prong of the *SOCM* test. They would be unable to show that they charged below-market rates. Accordingly, they would be unable to take advantage of *SOCM*'s limited exception to the *Laffey* rule that "[s]o long as the firm's own rate falls within the rate brackets, it is the market rate for purposes of calculating the lodestar." *Laffey*, 746 F.2d at 25 (emphasis deleted). (*SOCM* overruled this proposition of *Laffey* only with respect to counsel who can meet *SOCM*'s two-pronged test. *See SOCM*, 857 F.2d at 1524.)

However, this court cannot rely on hearsay newspaper surveys. *See, e.g., United States v. Casson*, 434 F.2d 415, 418 (D.C.Cir.1970) ("Hearsay newspaper statements are not a sufficient basis for overcoming the best evidence of which the case is susceptible and

the presumption of regularity."). If the parties had deposed the journalists who compiled the surveys, perhaps the surveys' reliability could have been probed. The parties, however, did not do so.

Putting the newspaper surveys to one side, the *evidence* before the court is the two matrices and several affidavits, all of which record a prevailing market rate that is higher than the fees that lead counsel charged. Similarly, the fees charged by other members of plaintiffs' legal team—by Messrs. Both and Edelman; by Colwell; by Moser and Kaler; and by the law clerks—are all below market.[10] Accordingly, plaintiffs have established that their counsel charged below-market rates, and have satisfied the second prong of the *SOCM* test.

Plaintiffs have also established that their counsel lowered their fees out of public interest motives, satisfying the first prong. By enacting a mandatory fee-shifting statute to help antitrust plaintiffs bring suits, Congress determined that antitrust actions were in the public interest. Congress believed that the proper enforcement of the antitrust laws is important to the nation's economic health. *See, e.g., Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262, 92 S.Ct. 885, 891, 31 L.Ed.2d 184 (1972) ("Every violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress."). The method Congress chose for the enforcement of the antitrust laws is largely private lawsuits. *See, e.g., Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. 240, 263, 95 S.Ct. 1612, 1624, 44 L.Ed.2d 141 (1975) (citing antitrust as "prime example" of law that Congress intended to be enforced by private

---

twenty years' experience or more, the U.S. Attorney's fee matrix recorded the prevailing market rate as $285 per hour, and the *Laffey* fee matrix recorded the prevailing market rate as more than $265.

In 1992–93, Mr. Yablonski received $270–295 per hour. (Pls.' Supp.Mem. at 4.) For work performed in this time period by lawyers of twenty years' experience or more, the U.S. Attorney's fee matrix recorded the prevailing market rate as $300 per hour. The *Laffey* fee matrix, if extrapolated by adding $10 annually since 1988–89, would record the prevailing market rate as $305 per hour for 1992–93. (Although district courts have approved of this method of updating

the *Laffey* matrix, *see, e.g., Covington*, No. 87–2658, Mem.Op. at 14; *Robles v. United States of America*, No. 84–3635, Mem.Op. at 16 & n. 7, 1992 WL 558952 (D.D.C. Jan. 10, 1992), at a certain point such rough estimations of the rise in legal rates become unreliable. Perhaps that point has been reached here. In any event, the court cannot and does not rely heavily on such evidence. The *Laffey* matrix will have to be updated with hard evidence and not guesswork extrapolation if it is to remain reliable.)

**10.** *See infra* nn. 14–17.

actions); *Zenith Corp. v. Hazeltine*, 395 U.S. 100, 130–31, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969) (encouraging private antitrust actions "serve[s] the high purpose of enforcing the antitrust laws"); *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 139, 88 S.Ct. 1981, 1984, 20 L.Ed.2d 982 (1968) (private antitrust actions are the "bulwark of antitrust enforcement").

Defendants counter that the rich antitrust plaintiffs in *Brown* do not need "discounted rates to assert their rights." (Defs.' Resp. to Pls.' Supp. Mem. at 8 n. 8.) However, counsel who lower their fees simply "to reflect ... what the attorney [sees] as the importance and justice of the client's cause" are entitled to market rates, even if their clients are not destitute. *SOCM*, 857 F.2d at 1519. It is clear that Mr. Yablonski and his firm believe in the justice of their clients' cause. He states that "we believe in the causes of working people, including those who suit up to play football in the NFL" (Supp. Decl. of Yablonski at ¶ 14), and his lifetime of work for labor interests supports his statement. (Since the mid–1960s, he has worked for the National Labor Relations Board, the Miners' Project, United Mine Workers of America, for various workers, trade unionists, and labor unions, and more recently in mine-explosion litigation and products liability cases. (Supp. Decl. of Yablonski at ¶¶ 10, 13.))

In sum, the evidence that plaintiffs have produced in their supplemental memoranda convinces this court that nothing has materially changed since 1988, when the Court of Appeals ruled that Mr. Yablonski charged below market rates in order to take cases for the public good. *See SOCM*, 857 F.2d at 1518. Then, as now, his clients may recover

his market rates—not his lower, actual rates—for his work.

Having determined that plaintiffs are entitled to prevailing market rates, this court turns to the next task of ascertaining the prevailing market rates for the work that plaintiffs' counsel performed.

Plaintiffs are, of course, entitled to the fees that their counsels' services demand in the marketplace. For the impressive antitrust work counsel performed in this case, plaintiffs are entitled to the fees that similarly experienced antitrust lawyers command in the District of Columbia. Although it is "widely believed" that antitrust lawyers are among the most generously compensated attorneys, plaintiffs' best efforts have not produced evidence that a submarket of antitrust lawyers actually command different (higher) fees than other lawyers in town. (Pls.' Supp.Mem. at 6, 17.) From plaintiffs' evidence, it appears that lawyers performing antitrust work charge the same rates as lawyers performing many other types of legal work. (Pls.' Supp.Mem. at 6.) Accordingly, plaintiffs may only recover these general commercial rates for their counsels' antitrust work in this case.

The general commercial rates can be gleaned from the matrices and affidavits that plaintiffs have produced. (The newspaper surveys that plaintiffs produced are not competent evidence. *See supra* at 10.) Since lawyers' rates vary with years of experience, the rates of each member of plaintiffs' legal team will be examined separately.

The matrices and affidavits that plaintiffs have produced support their requested $325 hourly rate for the work of Mr. Yablonski, their lead counsel.[11] Some of the evidence shows that the prevailing market rate for a lawyer with Mr. Yablonski's twenty

---

**11.** Plaintiffs originally requested $325 per hour for the work of Mr. Yablonski. (Mem. In Support of Pls.' Application for Attorney's Fees and Litigation Expenses, filed Oct. 26, 1992, at 18–19; Pls.' Supplemental Mem. in Support of Application for Attorney's Fees and Litigation Expenses, filed May 21, 1993, at 3; Pls.' [Second] Supplemental Mem. in Support of Application for Attorney's Fees and Litigation Costs, filed July 16, 1993, at 3.)

After this court noted in *dicta* that plaintiffs had collected evidence that lawyers of Mr. Ya-

blonski's experience currently earn between $325 and $340 per hour (Mem.Op. at 4), plaintiffs upped their request to $340 per hour. (Pls.' Supp.Mem. at 16.)

As analyzed in the text above, plaintiffs' evidence, viewed critically, supports plaintiffs' original $325 per hour request more firmly than plaintiffs' newly raised request. Accordingly, plaintiffs will be held to their original fee request of $325 per hour.

years of experience is somewhat lower than the requested $325 per hour;[12] some evidence shows that the rate is somewhat higher.[13] The $325 hourly rate appears reasonable, and defendants have not directly challenged it as unreasonable. (Defendants have argued forcefully, if unsuccessfully, that plaintiffs are entitled only to their counsels' billing rates. Defendants have not argued in the alternative that if plaintiffs are indeed entitled to the prevailing market rate, plaintiffs' evidence of that rate is unreliable or inaccurate.)

▉ Similarly, the evidence for other lawyers who worked with Mr. Yablonski on this case—Messrs. Both and Edelman;[14] Colwell;[15] Moser and Kaler;[16] and the law clerks[17]—supports their requested hourly rates. Accordingly, plaintiffs will receive their requested rates for each member of their legal team.

▉ As this court has already determined, plaintiffs are entitled to current rates[18] instead of historical rates in order to compensate for the three-year delay in payment. (Mem.Op. 839 F.Supp. at 918.) Lengthy delays in payment warrant compensation, and the award of current rates—concededly a rough measure of compensation—has been approved by the Supreme Court. *See Missouri v. Jenkins,* 491 U.S. 274, 283–84, 109 S.Ct. 2463, 2469, 105 L.Ed.2d 229 (1989).

▉ In their supplemental memorandum, defendants appear to ask this court to recon-

---

**12.** For example, the U.S. Attorney's fee matrix would award only $300 per hour for 1992–93.

The *Laffey* matrix, if extrapolated by adding $10 annually since 1988–89, would award him $305 for 1992–93. *See supra* n. 9.

**13.** According to an affidavit filed by Mr. Daniel A. Rezneck in the Oliver North fee litigation, the Arnold & Porter billing rate in 1992 for a lawyer of Mr. Yablonski's experience was $330 per hour. (Fourth Supp.Decl. of Yablonski, Ex. 5 at ¶ 9.) Mr. Rezneck is a partner at Arnold & Porter and was plaintiffs' counsel in *Laffey.* (Fourth Supp. Decl. of Yablonski, Ex. 5 at ¶¶ 1, 5.)

According to an affidavit filed by Mr. Peter J. Nickles in another fee case, the "reasonable hourly rates for the Washington, D.C. area" for lawyers of Mr. Yablonski's experience in 1992–93 was $343.17 per hour. (Fourth Supp.Decl. of Yablonski, Ex. 10 at Schedule 1.)

**14.** Plaintiffs seek $275 per hour for the work of Messrs. Edelman and Both, both lawyers with more than twenty years' experience. (Pls.' Supp. Mem. at 13–14.)

The evidence that supports a $325 hourly rate for Mr. Yablonski, analyzed above, easily supports these more modest fee requests for Messrs. Edelman and Both.

**15.** Plaintiffs seek $150 per hour for the work of Mr. Colwell, a lawyer of 8–10 years of experience. (Pls.' Supp.Mem. at 14–15.)

Plaintiffs' evidence supports that award. According to Mr. Rezneck's affidavit in the Oliver North fee litigation, the Arnold & Porter billing rate in late 1992 for a lawyer of Mr. Colwell's experience was $230 per hour. (Fourth Supp. Decl. of Yablonski, Ex. 5 at ¶ 9.)

According to Mr. Nickles' affidavit in another fee case, the "reasonable hourly rates for the Washington, D.C. area" for lawyers with five years' experience in 1992–93 was $185 per hour.

(Fourth Supp.Decl. of Yablonski, Ex. 10 at Schedule 1.)

Defendants' counter-evidence is drawn only from fee surveys in the *Legal Times,* which are not competent evidence.

**16.** Plaintiffs seek $105 and $100 per hour for the work of Messrs. Moser and Kaler, respectively. (Pls.' Supp.Mem. at 15.) Both are 1990 law school graduates.

Plaintiffs' evidence supports these fee requests. According to the U.S. Attorney's fee matrix, lawyers with less than three years' experience were billed at $130 per hour in 1992–93.

Similarly, according to Mr. Rezneck's affidavit in the Oliver North fee litigation, the Arnold & Porter billing rate in late 1992 for lawyers with two years' experience was $165 per hour. (Fourth Supp.Decl. of Yablonski, Ex. 5 at ¶ 9.)

**17.** Plaintiffs seek $45 per hour for the work of law clerk Maxwell Cohen (Pls.' Supp.Mem. at 15), a rate supported by plaintiffs' evidence. According to the U.S. Attorney's fee matrix, law clerks in the District were billed at $75 per hour in 1992–93.

Plaintiffs also seek $85 per hour for the part-time work of Mr. Moser in late 1991 and early 1992, while he was finishing work towards a masters degree in tax law at Georgetown. (Pls.' Supp.Mem. at 15–16.) (By contrast, plaintiffs seek $105 per hour for Moser's work in late 1992, after he had completed his L.L.M. *See supra* n. 16.) Recent law graduates like Mr. Moser earned $130 per hour in 1992–93, according to the U.S. Attorney's fee matrix.

**18.** Because 1994 is young and because plaintiffs seek compensation only for work done up to June 1993, the current rates for the purposes of this fee award are the rates of 1992–93, not 1993–94. Plaintiffs' requested rates are all 1992–93 rates.

sider its decision to award current rates instead of historical rates. Supplemental discovery has disclosed that plaintiffs paid their counsel regularly during this litigation, and defendants argue that this makes a difference. They note, correctly, that the regular payments minimized *for counsel* the hardship of three years' delay in payment. (Defs.' Resp. to Pls.' Supp.Mem. at 12–15.)

■ Yet the regular payments simply shifted the hardship from plaintiffs' counsel to plaintiffs. Plaintiffs, if not their counsel, were deprived for three to four years of the use of the funds that they paid to counsel. "The fact that the cost is borne by the client and not the attorney does not alleviate the hardship of waiting for attorney's fees until the end of the litigation. Any other result would create an incentive for plaintiffs not to pay their attorneys until the conclusion of the litigation." *Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 414, 425 (3d Cir.1993). Since plaintiffs' attorneys plan to reimburse plaintiffs for the fees paid to date (Pls.' Supp. Reply at 16 n. 16), plaintiffs and their counsel can be seen as a single economic unit for these purposes. A hardship to one in effect harms the other. Accordingly, plaintiffs are entitled to an award at current market rates.

### B. Number of Hours

■ In the Order of December 13, 1993, this court gave defendants the opportunity to file supplemental briefs on two challenged classes of tasks that plaintiffs' counsel performed: factual and legal research tasks, and clerical tasks. (Mem.Op. at 15–16; Order of Dec. 13, 1993 at ¶ C(1).)

In their opposition to the original fee application, defendants had contested liability for the time plaintiffs' high-rate lawyers spent on basic factual and legal research and on clerical tasks. Rejecting their argument, this court determined that plaintiffs were entitled to prevailing market rates for all their counsels' time, because to force plaintiffs' counsel—a small firm—to delegate research to lower-paid associates would be inefficient in this case. However, in rejecting defendants' argument the court gave defendants a chance to show in a supplemental memorandum that

the market rate is low for experienced lawyers who perform the work of inexperienced lawyers. (Mem.Op. at 17–19.)

Yet defendants' supplemental memorandum has not provided this court with any evidence of such lower rates. Defendants had the burden of producing evidence of lower rates for "mixed" high-skill and low-skill work, and they did not meet their burden. They had the chance in their supplemental memorandum to offer evidence that experienced counsel who occasionally perform low-skill (if important) tasks do not command the same high rates of experienced counsel who perform high-skill tasks exclusively. They might have shown that plaintiffs' matrices and affidavits compile the rates of big law firms in which experienced lawyers confine themselves to high-skill tasks, and they might have then argued that plaintiffs may be overcompensated if they get matrix rates for mixed tasks. Yet defendants did not produce such evidence.

■ Further, the two solutions that defendants propose—reducing plaintiffs' counsels' total time by twenty percent, or awarding only paralegal rates for the hours at issue—clearly undercompensate plaintiffs. (Defs.' Resp. to Pls.' Supp.Mem. at 15.) Slashing counsels' total time by twenty percent cuts too deeply, since the contested hours only amount to a very small fraction of the time plaintiffs' counsel devoted to this case. It is true that the Court of Appeals has considered such cuts appropriate when fee applicants couple a request for lawyers' rates for paralegal work with a request for compensation for hundreds of hours of duplicative time, wasted time, and time expended on losing issues. *See ASH,* 724 F.2d at 222–23. Here, by contrast, plaintiffs' counsel generally used good billing judgment and reduced or eliminated questionable hours in negotiations with defendants. (Pls.' Reply Mem. in Support of Application for Attorney's Fees at 19 n. 16.)

■ Defendants' alternative solution—awarding paralegal rates for the hours at issue—is also too harsh. Mr. Yablonski's performance of research and clerical tasks accomplished more than a paralegal or law

clerk could have accomplished. Immersing himself personally in the facts and management of this case proved a good tactical decision which helped plaintiffs win their case. His performance of low-skill tasks was not a second-best option necessitated by a shortage of law clerks or paralegals on his staff; it was a smart strategic choice.

Accordingly, plaintiffs will recover their requested rates for the contested hours.

### C. Investigation and Data Research Costs

■ The only cost issue for which supplemental memoranda was permitted was the question of investigation and data research costs. Originally, this court disallowed plaintiffs' requested expense of $6,275.78 for "investigation and data research," because it was not clear what the claimed cost covered. Courts have statutory authority only to shift certain costs, and because the court did not know what "investigation and data research" was, the court denied plaintiffs' request rather than risk exceeding its statutory authority to shift fees.

In their supplemental memorandum, plaintiffs have described this cost in greater detail. It was the cost of "gathering of data concerning Defendants' experts, their backgrounds, prior testimony and involvement with the NFL which was necessitated, in large part, because the parties agreed not to conduct formal expert-witness discovery. The information that was gathered concerning Economists, Inc., its principals and employees, their rates and relationship with the NFL was used in cross-examination of Dr. Walker and would have been used even further if Defendants had called Dr. Greenhalgh whom they had also listed as an expert witness." (Pls.' Supp.Mem. at 19.)

Based on plaintiffs' supplemental memorandum, it appears that plaintiffs' investigation costs are simply one of the incidental legal expenses that lawyers bill to private clients routinely. Defendants have not challenged the reasonableness of the investigation costs. Accordingly, plaintiffs shall be awarded their $6,275.78 in investigation costs.

### III. CONCLUSION

For litigating this case, plaintiffs will be awarded fees and costs in accordance with the chart set forth as Appendix B to this memorandum opinion. All of the decisions of this memorandum opinion—on defendants' witnesses' expenses, on compensation for time at trial, on counsels' rates, on counsels' hours, and on plaintiffs' investigation costs—are incorporated into the chart.

A separate order shall issue this date.

# APPENDIX A
## U.S. ATTORNEY'S OFFICE'S MATRIX

Years (Rate for June 1—May 31, based on prior year's CPI)

| Experience | 80–81 | 81–82 | 82–83 | 83–84 | 84–85 | 85–86 | 86–87 | 87–88 | 88–89 | 89–90 | 90–91 | 91–92 | 92–93 | 93–94 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20 + years | 165 | 175 | 185 | 195 | 205 | 210 | 220 | 230 | 245 | 260 | 275 | 285 | 300 | 305 |
| 11–19 years | 140 | 150 | 160 | 170 | 180 | 185 | 190 | 200 | 210 | 225 | 240 | 250 | 265 | 265 |
| 8–10 years | 120 | 125 | 130 | 135 | 140 | 145 | 150 | 155 | 165 | 175 | 185 | 195 | 210 | 215 |
| 4–7 years | 95 | 100 | 105 | 110 | 115 | 120 | 125 | 130 | 140 | 150 | 160 | 165 | 170 | 175 |
| 1–3 years | 70 | 75 | 80 | 85 | 90 | 95 | 100 | 105 | 110 | 115 | 120 | 125 | 130 | 135 |
| Parale-gals/law clerks | 30 | 35 | 35 | 40 | 40 | 45 | 50 | 55 | 60 | 65 | 70 | 75 | 75 | 75 |

Methodology note: Leffey, decided in 1982, set fees for work done in 1981–82. The fees in this matrix are calculated by adding Consumer Price Index (Washington, D.C. Metropolitan Area) increase to the applicable Leffey rate for the prior year, then rounding (up, if within $3 of the next multiple of $5). The result is then adjusted to ensure that the relationship between the highest rate and the lower rates remains reasonably constant.

---

# APPENDIX B
ATTORNEY'S FEES AND COSTS

| CATEGORY | J.A. YABLONSKI | D.B. EDELMAN | C.R. BOTH | J.F. COLWELL | J.C. MOSER | R.G. KALER | TOTAL ATTY HRS. BY CATEGORY |
|---|---|---|---|---|---|---|---|
| A. Up to Class Certification | 285.50 | 0.50 | | 47.75 | | | 333.75 |
| B. Non-Statutory Labor Exemption | 348.75 | 16.50 | | 5.50 | | | 370.75 |
| C. Liability Summary Judgment | 196.25 | 7.00 | | 13.00 | | | 216.25 |
| D. 6/5/91–3/10/92 | 328.75 | 3.75 | | 55.50 | | | 388.00 |
| E. Discovery | 922.50 | 628.50 | | 163.50 | 619.75 | 475.75 | 2,810.00 |
| F. Final Pre–Trial Preparation | 217.00 | 100.25 | . | 110.00 | 190.75 | 194.75 | 812.75 |
| G. Trial | 341.50 | 254.00 | 70.75 | 173.44 | 223.13 | 210.75 | 1,273.57 |
| H. Post–Trial | 53.50 | 28.50 | 1.50 | 48.25 | | 60.50 | 192.25 |
| I. Fee Application | 56.00 | 3.50 | | 2.00 | | 23.00 | 84.50 |
| SUBTOTAL HRS. | 2,749.75 | 1,042.50 | 72.25 | 618.94 | 1,033.63 | 964.75 | 6,481.82 |
| 1ST SUPP. | 82.75 | 40.75 | | 8.00 | | 34.75 | 166.25 |
| 2ND SUPP. | 100.25 | 8.25 | | 8.50 | | 2.00 | 119.00 |
| TOTAL HRS. | 2,932.75 | 1,091.50 | 72.25 | 635.44 | 1,033.63 | 1,001.50 | 6,767.07 |
| x RATE | $325.00 | $275.00 | $275.00 | $150.00 | $105.00 | $100.00 | |
| TOTAL ATTORNEY'S FEES | $953,143.75 | $300,162.50 | $19,868.75 | $95,316.00 | $108,531.15 | $100,150.00 | $1,577.172.15 |
| LAW CLERKS: | | | | | | | |
| M. COHEN: 249.75 hrs × $45 | | | | | | $11,238.75 | |
| J. MOSER: 162.00 hrs × $85 | | | | | | $13,770.00 | $25,008.75 |
| GRAND TOTAL FEES | | | | | | | $1,602,180.90 |
| EXPENSES (Initial Application) | | | | | | $139,970.58 | |
| 1ST SUPP. EXPENSES | | | | | | $1,690.95 | |
| 2ND SUPP. EXPENSES | | | | | | $735.98 | |
| TOTAL EXPENSES | | | | | | | $142,397.51 |
| TOTAL FEES AND EXPENSES | | | | | | | $1,744,578.41 |

*ORDER*

This matter comes before this court on plaintiffs' motion for reconsideration of this court's Order of December 13, 1993 and on the parties' supplemental memoranda requested by that order. Upon consideration of the record herein, it is hereby, for the reasons set forth in an accompanying memorandum opinion issued this date, ORDERED that

1. Plaintiffs' request for reconsideration of this court's determination to disallow the costs of defendants' witnesses is granted. Plaintiffs are awarded $1,764.00 for defendants' witnesses' costs. (This amount has been incorporated into the award granted to plaintiffs in ¶ 3 of this order.)

2. Plaintiffs' request for reconsideration of this court's refusal to shift the fees of Messrs. Colwell, Moser, and Kaler for their time during trial is granted. Plaintiffs are awarded compensation for seventy-five percent of the claimed trial time of Messrs. Colwell, Moser, and Kaler. (This amount has been incorporated into the award granted to plaintiffs in ¶ 3 of this order.)

3. Plaintiffs' application for attorney's fees and expenses is granted. Defendants shall, within forty-five days of the date of this order, pay plaintiffs attorney's fees and expenses in the amount of $1,744,578.41.

SO ORDERED.