**Leroy R. JEFFERSON, Plaintiff,**

**v.**

**MILVETS SYSTEM TECHNOLOGY, INC., Defendant.**

**No. CIV.A. 96–2624(SS).**

United States District Court, District of Columbia.

Nov. 25, 1997.

Thomas Turner Ruffin, Washington, DC, for Plaintiff.

Willard N. Belden, III, Riley & Artabane, P.C., Washington, DC, Rex L. Fuller, III, Chesapeake Beach, MD, for Defendant Milnets System Technology, Inc.

Charles Francis Flynn, U.S. Atty's Office, Washington, DC, for Federal Defendant Librarian of Congress.

## MEMORANDUM OPINION

SPORKIN, District Judge.

### I. Introduction

On April 22, 1997, a jury rendered its verdict for the plaintiff on his claim for retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–3(a), awarding him $50,000 in compensatory damages and $150,000 in punitive damages against the defendant, Milvets System Technology, Inc. ("Milvets"). The Clerk entered judgment on the verdict, but, on April 29, 1997, the Court stayed execution on the judgment until it had resolved all post-judgment issues, including the plaintiff's entitlement to equitable relief and attorney's fees and whether and to what extent the damages award must be reduced pursuant to 42 U.S.C. § 1981a(b)(3), which limits a Title VII damages award based on the number of employees a defendant has.

On June 12, 1997, the Court heard oral argument on these post-trial issues and on several other outstanding issues. Via an oral ruling, the Court denied the plaintiff's motion for Rule 11 sanctions; denied the plaintiff's request for injunctive relief, denied the plaintiff's motion to tax costs, without prejudice to his right to seek costs pursuant to Rule 214(c) of the Local Rules; denied the defendant's motion for judgment as a matter of law; and denied the defendant's motion for a new trial. Additionally, the Court secured the parties' consent to the appointment of a Special Master whose task would be to determine the number of employees Milvets had in 1994 and 1995, whereupon the Court would decide by how much, if any, to reduce the jury's damages award in accordance with § 1981a(b)(3). The Court took all remaining issues under advisement.

For the reasons discussed below, the Court shall now deny the plaintiff's motion to amend his complaint, without prejudice to his right to re-file his defamation claim in the Superior Court for the District of Columbia; dismiss the defendant's counterclaims against the plaintiff, without prejudice to its right to re-file these claims in the Superior Court; grant in part the plaintiff's motion for back pay; deny the plaintiff's motion for front pay; grant in part the plaintiff's motion for attorney's fees, adopt the Special Master's report which concludes that Milvets had less than 101 employees in both 1994 and 1995; and reduce the jury's damages award by $150,000 to comport with § 1981 a(b)(3) The plaintiff also shall be awarded pre-judgment interest on the back pay and post-judgment interest on his damages, his attorney's fees, and on the combined sum of his back pay and the pre-judgment interest on the back pay.

### II. Discussion

A. *The Plaintiff's Motion to Amend the Complaint Shall Be Denied, and the Defendant's Counterclaims Shall Be Dismissed.*

The defendant has alleged four counterclaims against the plaintiff for "breach of employment," fraud, "breach of agency," and "conspiracy." The defendant claims that, while the plaintiff was employed at Milvets, he prepared fraudulent time-sheets, lost or stole computer equipment (or conspired to do the same), pursued his own business opportunities on company time, and failed to use his best efforts as a Milvets employee.

In March, the plaintiff moved to amend his complaint, claiming that his former supervisor and the president of Milvets had defamed him by telling other employees that he had conspired with another employee to steal computer equipment. The plaintiff's motion to amend also sought to pierce the corporate veil to impose individual liability on Bob Dan-

iels as sole shareholder of Milvets, which, according to the plaintiff, does not observe any of the corporate formalities.

The Court deferred ruling on the plaintiff's motion until after trial. The Court also decided not to present the defendant's counterclaims to the jury, without formally dismissing these claims

At oral argument on June 12, the plaintiff informed the Court that he did not object to pursuing his defamation claim in the Superior Court. Further, the Court finds that adjudication of the parties' five common law claims would substantially predominate over the plaintiff's single Federal claim under Title VII. *See* 28 U.S.C. § 1367(c)(2). Accordingly, the Court shall deny the plaintiff's motion to amend and dismiss the defendant's four counterclaims, without prejudice to the defendant's right to re-file these claims in the Superior Court.

B. *The Plaintiff's Motion for Back Pay Shall Be Granted In Part, But His Motion for Front Pay Shall Be Denied.*

 The plaintiff has moved for an award of $30,790 in back pay, $72,800 in front pay, and prejudgment and post-judgment interest on the back pay and front pay. The plaintiff earned $14.25 per hour at Milvets, where he worked 40 hours a week for a period of two months, from July 24, 1995 to September 26, 1995. The plaintiff did not begin working again until April 1, 1996, when he started working part-time for Technology Service Solutions ("TSS"). The plaintiff earns $14.50 per hour at TSS. There is no dispute that the plaintiff's job at TSS is comparable to his job at Milvets in terms of job requirements and is superior in terms of pay. The plaintiff, however, works only 20 hours per week, purportedly because of the continued emotional pain stemming from his termination from Milvets. The plaintiff fur-

ther alleges that he will not be able to work full-time for another 5 years into the future.

The Court finds the plaintiff's claim for more than a year-and-a-half of back pay and five years of front pay to be utterly speculative. While there was sufficient evidence for a reasonable jury to find that the plaintiff had suffered some compensable, emotional distress at the hands of the defendant,[1] the plaintiff has pointed to no probative evidence (such as expert testimony from a psychologist or a physician) that this emotional distress has precluded him from working full-time and will continue to do so for another five years. Indeed, the plaintiff's trial testimony that he began therapy well over a year after his discharge and then for the purpose of supporting his claim for compensatory damages severely undermines any such contention.

The plaintiff had and continues to have a statutory duty to minimize damages by using "reasonable diligence in finding other suitable employment." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231, 102 S.Ct. 3057, 3065, 73 L.Ed.2d 721 (1982); *see also* 42 U.S.C. § 2000e–5(g)(1) ("Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable."). This duty to mitigate also applies to "underemployed" Title VII claimants like the plaintiff, who works only part-time. *Ford Motor Co.*, 458 U.S. at 231, 102 S.Ct. at 3065. Here, the evidence before the Court shows that the plaintiff has been underemployed voluntarily. Without more, the plaintiff's mere assertion that he has not felt and does not feel he can work at his current job on a full-time basis is far too speculative to justify an award of back pay and front pay for so many years. Thus, the plaintiff has failed to mitigate his economic damages at least since the time he accepted his job with TSS in April of 1996.

---

1. The plaintiff and his fiancee, Leslie Godsey, testified about several mental and physical manifestations of emotional distress stemming from his termination from Milvets, including sleeplessness, lethargy, gastrointestinal difficulties, decreased sex drive, humiliation, lowered self-esteem, and inordinate alcohol consumption. Such testimony could permit the jury to award the plaintiff compensatory damages for specific discernible injury to his emotional state. Expert medical testimony was not required. *See, e.g., Bolden v. SEPTA*, 21 F.3d 29, 34 (3rd Cir.1994) (§ 1983 case; holding that plaintiff could recover for emotional distress, absent expert medical testimony).

The defendant also has directed the Court to undisputed testimony and affidavit evidence showing that Milvets lost its contract with the Library of Congress effective November 30, 1995 and that all of the Milvets employees at the Library of Congress lost their positions with Milvets on that date. According to the defendant, the proper period for back pay is from September 27, 1995 through November 30, 1995, amounting to approximately 360 hours of work at $14.25, or $5,130.

The plaintiff counters that, after November 30, all Milvets employees at the Library of Congress location started immediately to work for United Communication Systems, and that these Milvets employees had received favorable recommendations from Milvets. But for the retaliation against him, the plaintiff argues, the plaintiff also would have been re-employed by United Communication Systems.

The Court agrees that if the evidence suggested that the plaintiff would have been re-employed by United Communications, his entitlement to back pay would not necessarily cease on November 30. The plaintiff, however, has not pointed the Court to any supporting evidence, only the unsworn assertions of counsel. The Court has no way of knowing if United Communications hired former Milvets employees, let alone those with the plaintiff's background and experience. Moreover, the plaintiff has provided the Court with no basis to estimate how long he likely would have been employed by United Communications. Thus, the Court shall accept the defendant's back pay calculation. *See Waters v. Wisconsin Steel Works of Int'l Harvester Co.,* 502 F.2d 1309, 1321–22 (7th Cir.1974) (claim for wages from second job that the plaintiff claimed he could have held had he been employed by the defendant rejected as speculative and remote), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976).

The defendant further argues that the Court should offset the plaintiff's unemployment compensation payments against any back pay award. The defendant has not shown, however, what amount of unemployment compensation, if any, the plaintiff received between September 27 and November 30. Also, several courts of appeal have refused to offset unemployment compensation payments against back pay awards. *See Daniel v. Loveridge,* 32 F.3d 1472, 1478 n. 4 (10th Cir.1994); *Gaworski v. ITT Commercial Finance Corp.,* 17 F.3d 1104, 1112–14 (8th Cir.), *cert. denied,* 513 U.S. 946, 115 S.Ct. 355, 130 L.Ed.2d 310 (1994). Accordingly, the defendant is not entitled to an offset.

Neither the plaintiff nor the defendant has suggested a methodology whereby the Court is to calculate pre-judgment interest on the back pay award. Therefore, the Court holds that pre-judgment interest shall be calculated in accordance with 28 U.S.C. § 1961, which governs post-judgment interest. *See Sun Ship, Inc. v. Matson Navigation Co.,* 785 F.2d 59, 63 (3d Cir.1986) (holding that a court may use the post-judgment standards of 28 U.S.C. § 1961(a) when calculating pre-judgment interest on a back pay award). The plaintiff shall be entitled to pre-judgment interest on the $5.130 of back pay at a rate of 5.45%.[2] The interest shall be computed daily from the date of the last day of the back pay period, November 30, 1995, until the date of the judgment, April 22, 1997, and shall be compounded annually.

The plaintiff also shall be entitled to post-judgment interest on the combined sum of the back pay award and the pre-judgment interest on the back pay award. The post-judgment interest shall be computed daily from the date judgment in this case was entered, April 22, 1997, until the date the judgment is paid.

## C. The Plaintiff's Motion for Attorney's Fees Shall Be Granted in Part.

■ Title VII gives the Court the discretion to award a prevailing party like the plaintiff "a reasonable attorney's fee." 42 U.S.C. § 2000e–5(k). To determine a "reasonable" fee award, the Court must multiply

---

2. The coupon issue yield equivalent of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the last day of the back pay period (November 15, 1995) was 5.45%.

"the number of hours reasonably expended on the litigation ... by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983).[3] "Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Id.*

### 1. *The Number of Hours Reasonably Expended*

The plaintiff seeks attorney's fees in the amount of $106,520. He calculates this amount based on 532.6 hours of work his attorney, Mr. Thomas Ruffin, performed from the time the complaint was drafted through April 25, 1997, at a rate of $200 per hour.

The defendant has questioned 169.8 of Mr. Ruffin's hours by highlighting specific charges on Mr. Ruffin's time-sheets. The defendant argues that certain charges related to Mr. Ruffin's travel time, drafting of motions and trial preparation are either "unrelated" or "unnecessary."

For the most part, the Court is not persuaded by the defendant's vague and non-specific challenges to Mr. Ruffin's time charges. The defendant has been afforded ample time and opportunity to raise more specific objections to Mr. Ruffin's fees (such as through a Court-ordered meet and confer and briefing schedule with which neither party complied), but has failed to provide the Court with any more information. Thus, the Court finds not only that Mr. Ruffin's fee petition generally is sufficiently specific and evidences charges related to this litigation, but also that the majority of Mr. Ruffin's

time was reasonable in light of the contentiousness of the discovery proceedings, the number of witnesses, the length of the trial, the numerous pre-trial and post-trial motions, and the high degree of success he obtained for his client (i.e., a $200,000 verdict). *See, e.g., Castle v. Bentsen*, 872 F.Supp. 1062, 1068–69 (D.D.C.1995) (Richey, J.) (awarding attorney's fees for nearly 1,000 hours of attorney time where a single plaintiff had prevailed before a jury on her failure-to-promote and retaliation claims). Mr. Ruffin shall be entitled to fees for all of his claimed time, less the 56.2 hours which he has not adequately documented or explained, for a total of 476.4 hours.[4]

### 2. *The Reasonable Hourly Rate*

The plaintiff has submitted no evidence showing that Mr. Ruffin has an established billing history of charging $200 per hour. The defendant suggests that $95 per hour is the appropriate rate for Mr. Ruffin's services. Like the plaintiff, however, the defendant has not submitted any evidence that would justify such a rate.

"Where fee applicants' counsel lack an established billing history, they may collect fees based upon the 'prevailing market rates in the relevant community.'" *Shepherd v. Am. Broadcasting Companies*, 862 F.Supp. 505, 509–10 (D.D.C.1994) (Lamberth, J.) (quoting *Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984)), *vacated and remanded on other grounds*, 62 F.3d 1469 (D.C.Cir.1995). In this Circuit, several district courts have relied on two fee

---

3. The plaintiff has not requested that the Court apply a multiplier to the attorney's fee award.

4. The Court has no way to ascertain the relevance or purpose of the following legal services rendered by Mr. Ruffin: the calls to Mssrs. Preston and Perry on November 18, 1996 for 1.5 hours, the call to Mr. Preston on November 19 for .6 hours; the calls to Mr. Henderson on February 6, 1997 for .8 hours; the vague reference to "[d]rafting motions" for 9.0 hours on February 7; the vague references to "[f]inishing motions" for 2.8 hours on February 8; the vague references to "[d]rafting motions & other papers" and "[d]rafting documents/papers" for 8.8 hours on February 10; the calls and travel to Mr. Preston's office for .6 hours on February 11; the vague reference to "[d]rafting motions" for 2.5

hours on March 5; the vague reference to "further investigations" for up to 4.5 hours on April 16; the vague references to "investigations" and "[i]nvestigations & conference w/ Seck" for up to 10.4 hours on April 17; and the vague reference to "[i]nvestigations w/seck for more records" for 4.9 hours on April 18. In addition, the Court finds that the plaintiff's motion for Rule 11 sanctions was baseless, and therefore will not permit recovery for related attorney time (approximately 9.2 hours). Nor will the Court permit recovery for the .6 hours Mr. Ruffin spent on the non-attorney task of serving subpoenas on witnesses on April 2. In total, Mr. Ruffin shall not be compensated for 56.2 hours of claimed attorney time.

matrices to determine the prevailing market rates for attorney's fees. These matrices show what a reasonable hourly rate is for an attorney for a particular year based upon his or her years of experience. The use of one of these matrices (the so-called "*Laffey* matrix") was condoned by our Court of Appeals in *Laffey v. Northwest Airlines, Inc.,* 746 F.2d 4 (D.C.Cir.1984), *overruled in part on other grounds, Save Our Cumberland Mountains, Inc. v. Hodel,* 857 F.2d 1516 (D.C.Cir. 1988) (*en banc*). A more updated *Laffey* matrix is set forth in the appendix of *Covington v. District of Columbia,* 839 F.Supp. 894, 904 (D.D.C.1993) (Lamberth, J.), *aff'd,* 57 F.3d 1101 (D.C.Cir.1995), *cert. denied,* 516 U.S. 1115, 116 S.Ct. 916, 133 L.Ed.2d 847 (1996). The second fee matrix courts have utilized was developed by the U.S. Attorney's Office for the District of Columbia for use in settlements. The 1993–94 version is set forth in the appendix of *Brown v. Pro Football, Inc.,* 846 F.Supp. 108, 120 (D.D.C.1994) (Lamberth, J.), *rev'd on other grounds,* 50 F.3d 1041 (D.C.Cir.1995), *aff'd,* 518 U.S. 231, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996).

The Court takes judicial note of the fact that Mr. Ruffin has been practicing law for over ten years. Under either matrix, Mr. Ruffin arguably is entitled to an hourly fee greater than his claimed $200 per hour. *See Brown,* 846 F.Supp. at 120, app. A (depicting a U.S. Attorney's Office fee matrix for 1993 to 1994 which shows that a litigator with more than ten years of experience would have been entitled to at least $265 per hour); *Covington,* 839 F.Supp. at 904, app. A (depicting a *Laffey* fee matrix for the year 1988 which shows that a litigator with more than ten years of experience would have been entitled to an hourly rate of at least $220).

Accordingly, the plaintiff shall be entitled to $95,280 in attorney's fees (476.4 hours

times $200), an amount that fully comports with fee awards in comparable cases *See, e.g., Hayes v. Shalala,* 933 F.Supp. 21, 28 (D.D.C. 1996) (Friedman, J.) (awarding over $200,000 in attorney's fees in a single-plaintiff employment discrimination case); *Castle,* 872 F.Supp. at 1068–69 (awarding over $185,000 in attorney's fees).

The plaintiff also shall be entitled to post-judgment interest on the attorney's fees at a rate of 6.00%, in accordance with 28 U.S.C. § 1961.[5] *See Shaw v. Library of Congress,* 747 F.2d 1469, 1475 (1984) (interest allowed on Title VII attorney's fees award), *rev'd on other grounds,* 478 U.S. 310, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986). The interest shall be computed daily from the date judgment in this case was entered, April 22, 1997, until the date the judgment is paid, and shall be compounded annually. *See* 28 U.S.C. § 1961(b).

### D. *The $200,000 Jury Verdict Shall Be Reduced to $50,000.*

█ The jury awarded the plaintiff $50,000 in compensatory damages and $150,000 in punitive damages. Under the Civil Rights Act of 1991, if Milvets employed between 15 and 100 employees "in each of 20 or more calendar weeks" in 1995 (the year the plaintiff suffered retaliation) or 1994 (the preceding year), then the maximum combined sum of compensatory and punitive damages that the plaintiff can recover cannot exceed $50,000, and the jury's verdict would have to be reduced by $150,000. 42 U.S.C. § 1981a(b)(3)(A). If Milvets employed between 101 and 200 employees, the plaintiff is limited to a sum of $100,000, and the verdict would have to be cut by $100,000. *Id.* at § 1981a(b)(3)(B).[6]

---

5. The coupon issue yield equivalent of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of judgment (March 26, 1997) was 6.00%.

6. The plaintiff argues that the statutory cap applies to the compensatory damages award and the punitive damages award separately. Thus, assuming Milvets employed over 100 people, the plaintiff argues that his compensatory damage

award of $50,000 fits well under the $100,000 cap. Additionally, his punitive damages award of $150,000 should be reduced only by $50,000. The Court rejects this reading of § 1981a, because the damages cap applies to the *combined* sum of compensatory and punitive damages. *See Hogan v. Bangor and Aroostook R.R. Co.,* 61 F.3d 1034, 1037 (1st Cir.1995) (explicitly rejecting argument that statutory cap applies separately to compensatory and punitive damages awards).

The Special Master has determined that Milvets employed less than 101 employees in 1994 and 1995. *See* Special Master's Final Report, at p. 3 (October 28, 1997). Because the plaintiff has not shown that the Special Master's finding is clearly erroneous, the Court shall adopt his finding of fact and reduce the $200,000 damages award to $50,000.

Neither party has proposed a method by which the Court should reduce the damages award. It would be easiest for the Court simply to vacate the jury's $150,000 punitive damages award, thereby leaving the $50,000 compensatory damages award, which satisfies the damages cap. This method, however, would in some sense nullify the jury's finding that the defendant's conduct warranted punitive damages.[7] The Court finds it significant that three-fourths of the damages awarded to the plaintiff were punitive damages. Accordingly, three-fourths of the $50,000 to which the plaintiff is entitled, or $37,500, shall be allocated for punitive damages, and the other one-fourth, or $12,500, shall be allocated for compensatory damages. *See Jonasson v. Lutheran Child and Family*

*Services*, 115 F.3d 436, 441 (7th Cir.1997) (affirming district court's use of this methodology).

In accordance with 28 U.S.C. § 1961, the plaintiff shall be entitled to post-judgment interest on the $50,000 at a rate of 6.00%. The interest shall be computed daily from the date judgment in this case was entered, April 22, 1997, until the date the judgment is paid, and shall be compounded annually.

### III. Conclusion

For all the foregoing reasons, the plaintiff's motion to amend his complaint is denied, without prejudice to his right to re-file his defamation claim in the Superior Court for the District of Columbia. The defendant's counterclaims against the plaintiff are dismissed, without prejudice to its right to re-file these claims in the Superior Court. The Court shall lift the stay on execution of the judgment and modify the judgment to reflect that the plaintiff is entitled to $12,500 in compensatory damages, $37,500 in punitive damages and $5,130 in back pay, plus pre-judgment interest on the back pay. The plaintiff also shall be awarded $95,280 in

---

7. Evidence sufficient to establish an intentional violation of Title VII is sufficient to permit a jury to award punitive damages. *Kolstad v. Am. Dental Ass'n*, 108 F.3d 1431, 1438 (D.C.Cir.1997). Here, a reasonable jury could find that Milvets intentionally retaliated against the plaintiff because he had "opposed [a] practice made an unlawful employment practice" by Title VII. 42 U.S.C. § 2000e–3(a). The jury heard testimony that (1) the plaintiff's supervisor, Jacqueline McCullough, had a romantic relationship with the plaintiff's co-worker and friend, Richard Brown. and that McCullough was aware of Brown's friendship with the plaintiff; (2) McCullough attempted to remove Brown's supervisory authority and reduce his pay shortly after Brown had informed McCullough that he wished to end the relationship; (3) McCullough confronted the plaintiff, asked him why Brown was trying to ruin her and where the plaintiff would stand and whose side he would be on if Brown files a sexual harassment lawsuit against her; (4) the plaintiff told McCullough that he was there to do a job, that he felt that it was unfair for her to even ask him a question such as that, that he was "going to tell the truth," that, if asked, he would say that she and Brown were having a relationship, and that he would "testify" for Brown; (5) one month later, McCullough recommended that the plaintiff be terminated for poor performance, a termination that essentially was rubber-stamped by Milvets' president and Director of

Operations; and (6) several of the plaintiff's purported performance problems were questionable or unfounded.

This testimony, combined with the coincidental timing of Brown's discharge and the impeachment of several of the defendant's witnesses, could permit a reasonable jury to infer that the plaintiff was fired (via McCullough's recommendation) for (a) making known to McCullough his opposition to what he believed to be McCullough's sexual harassment of Brown, (b) McCullough's fear that the plaintiff would assist Brown in pursuing a Title VII claim, and/or (c) the plaintiff's friendship with Brown, who had threatened to file a sexual harassment lawsuit. Any of these inferences support a finding of retaliation by McCullough, who was an agent of Milvets. *See McDonnell v. Cisneros*, 84 F.3d 256, 262 (7th Cir.1996) (holding that employee need not necessarily actively oppose an unlawful employment practice to state a retaliation claim, because "[p]assive resistance is a time-honored form of opposition"); *EEOC v. Ohio Edison Co.*, 7 F.3d 541, 545–46 (6th Cir.1993) (holding that a fellow employee acting on behalf of a person who had engaged in protected activity may sue for retaliation); *DeMedina v. Reinhardt*, 444 F.Supp. 573, 580 (D.D.C.1978) (Richey, J.) (holding that the spouse of an employee who had engaged in protected activity may sue for retaliation).

attorney's fees and post-judgment interest on the attorney's fees, the $50,000 in damages, and on the combined sum of the back pay award and the pre-judgment interest on the back pay.

## ORDER AND FINAL JUDGMENT

For the reasons stated in the Court's Memorandum Opinion of the same date, it is hereby

ORDERED that the plaintiff's motion to amend his complaint is DENIED, without prejudice to his right to re-file his defamation claim in the Superior Court for the District of Columbia; and it is

FURTHER ORDERED that the defendant's four counterclaims against the plaintiff are dismissed, without prejudice to its right to re-file these claims in the Superior Court for the District of Columbia; and it is

FURTHER ORDERED that the plaintiff's motion for back pay is GRANTED in part. The defendant shall pay the plaintiff $5,130.00 in back pay plus pre-judgment interest thereon at a rate of 5.45%. The pre-judgment interest shall be computed daily from the date of the last day of the back pay period, November 30, 1995, until the date of the judgment, April 22, 1997, and shall be compounded annually. The defendant also shall pay the plaintiff post-judgment interest on the combined sum of $5,130.00 and the pre-judgment interest on the $5,130.00. The post-judgment interest shall be computed daily from the date judgment in this case was entered, April 22, 1997, until the date the judgment is paid; and it is

FURTHER ORDERED that the plaintiff's motion for front pay is DENIED; and it is

FURTHER ORDERED that the plaintiff's motion for attorney's fees is GRANTED in part. The defendant shall pay the plaintiff $95,280 in attorney's fees plus post-judgment interest thereon at a rate of 6.00%. The interest on the fees shall be computed daily from the date judgment in this case was entered, April 22, 1997, until the date the judgment is paid, and shall be compounded annually; and it is

FURTHER ORDERED that the Court ADOPTS the Special Master's finding of fact that the defendant employed less than 101 employees in both 1994 and 1995; and it is

FURTHER ORDERED that the judgment on the verdict entered on April 22, 1997 is REDUCED and MODIFIED to reflect that it is ORDERED, ADJUDGED and DECREED that the plaintiff Leroy R. Jefferson have and recover of and from the defendant Milvets System Technology, Inc. the sum of twelve thousand five hundred dollars in compensatory damages ($12,500.00) and thirty-seven thousand five hundred dollars in punitive damages ($37,500.00), together with costs and post-judgment interest on the $50,000 at a rate of 6.00%. The post-judgment interest shall be computed daily from the date judgment in this case was entered, April 22, 1997, until the date the judgment is paid, and shall be compounded annually; and it is

FURTHER ORDERED that the stay on execution of the judgment of April 22, 1997, as modified herein, is DISSOLVED; and it is

FURTHER ORDERED that any and all other pending motions are DENIED as MOOT; and it is

FURTHER ORDERED that the Clerk shall dismiss this case from the dockets of this Court.